First Division
August 27, 2007

1-06-0104 and 1-06-1179, consolidated

BOARD OF MANAGERS OF ELEVENTH STREET )
LOFTOMINIUM ASSOCIATION, )
)
    Plaintiff-Appellant, )
)
    v. )
) Appeal from the
WABASH LOFTOMINIUM, L.L.C., STEVEN E. GOULETAS, ) Circuit Court of
ANTHONY R. DiBENEDETTO, JAMES SCHWARK, NICHOLAS ) Cook County
V. GOULETAS, and NICHOLAS S. GOULETAS, )
) 04-L-04699 and
    Defendants-Appellees. ) 02-L-02788
)
_____ ) Honorable
) Jennifer Duncan-Brice
BOARD OF DIRECTORS OF THE GOLD COAST GALLERIA ) and
CONDOMINIUM ASSOCIATION, ) Dennis J. Burke,
) Judges Presiding
    Plaintiff-Appellant, )
)
    v. )
)
GALLERIA RESIDENTIAL, L.L.C., NICHOLAS V. GOULETAS, )
DESIREE GOUELTAS, BOB FORD, and STEVEN E. GOULETAS, )
)
    Defendants-Appellees. )

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

This is a consolidated, interlocutory appeal brought by plaintiff Board of Directors of the

Gold Coast Galleria Condominium Association and plaintiff Board of Managers of Eleventh

Street Loftominium Association from trial court orders disqualifying their attorney, the Chicago

law firm of Arnstein & Lehr LLP ("Arnstein").

The first plaintiff's lawsuit concerns a Chicago residential building located at 111 West

1-06-0104 and 1-06-1179, cons.

Maple Street which was converted into 331 residential condominium units in 1998 (No. 02-L-02788, the "Gold Coast Galleria") . The second plaintiff's lawsuit concerns a Chicago warehouse and offices located at 1020 South Wabash Avenue which were converted into 48 residential condominium lofts in 2000 (No. 04-L-04699, the "Loftominium"). The plaintiffs allege their respective property developer and associated individuals turned over unrepaired common elements and inadequate capital reserves. The suits were filed by attorney David Sugar while he was affiliated with the Chicago law firm Michael Best & Friedrich LLP. When Sugar joined Arnstein, the firm was routinely granted leave to substitute as plaintiffs' counsel. The defendants, however, moved to disqualify Sugar's new firm, contending Arnstein was already representing corporations that were or are managed by the individual defendants and that the common representation created a conflict of interest for Arnstein prohibited by Rule 1.7 of the Rules of Professional Conduct. 134 Ill. 2d R. 1.7. Rule 1.7 regulates an attorney's ability to undertake representation adverse to a present client, by providing, "A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after disclosure." 134 Ill. 2d R. 1.7. After briefing and oral arguments, Judge Jennifer Duncan-Brice found that a conflict existed in the Loftominum action and that Arnstein's failure to disclose it and obtain the prior consent of the defendants was a violation of Rule 1.7. 134 Ill. 2d R. 1.7. Judge Dennis J. Burke subsequently reached the same conclusions with respect to the Gold Coast Galleria action.

We granted the plaintiffs' petitions for leave to appeal under Supreme Court Rule

1-06-0104 and 1-06-1179, cons.

306(a)(7). 210 Ill. 2d R. 306(a)(7). The arguments for reversal include: (1) corporations are distinct for purposes of conflict of interest analysis, (2) because the representation Arnstein provided to the various nondefendant corporations was complete and unrelated to the two actions which attorney Sugar brought to the firm, Arnstein's conduct is permissible under the rule regarding former clients, Rule 1.9 (134 Ill. 2d R. 1.9), and (3) the defendants waived the right to complain of conflict. We review the trial court rulings for an abuse of discretion. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176, 685 N.E.2d 871, 876 (1997). An abuse of discretion occurs where no reasonable person would agree with the view adopted by the trial court. *Schwartz*, 177 Ill. 2d at 176, 685 N.E.2d at 876.

A preliminary consideration is a motion taken with the case. The defendants argue the petition for leave to appeal that was filed in the Loftominium action includes a Statement of Facts section which should be stricken because it is not the neutral recitation of relevant facts mandated by Supreme Court Rule 341(h)(6) and is instead "mischaracterization," "argument[,] and comment calculated to confuse *** and prejudice this Court." 210 Ill. 2d R. 341(h)(6) (formerly Rule 341(e)(6) (188 Ill. 2d R. 341(e)(6) and indicating the opening brief's statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument"). We agree that most of the Statement of Facts is argumentative and confusing. Entire paragraphs are devoted to criticizing and misstating the defendants' arguments for disqualification and the procedural history of the case is not made clear. Furthermore, the Statement of Facts does not convey a complete picture of the proceedings. For instance, it does not disclose that the defendants purport to have notified Arnstein of the conflict issue as early as

3

April 4, 2005, and that Arnstein contended this notification was not effective because it was made in a different lawsuit involving slightly different defendants (Arnstein represented the plaintiff in a case that was dismissed, No. 02-L-14549, Board of Managers of the Elm at Clark Condominium Association v. 1122 North Clark, L.L.C, Steven E. Gouletas, Anthony R. DiBenedetto, James Schwark, and Nicholas V. Gouletas). Also omitted are the facts necessary to understanding the plaintiffs' waiver argument. For these reasons, we grant the motion to strike. *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1052, 827 N.E.2d 949, 954 (2005).

With respect to the necessary facts, we also note that the Loftominium and Gold Coast Galleria briefs include numerous comments about the evidentiary basis for Arnstein's disqualification, but the plaintiffs never provide reasoned argument, citation to supporting legal authority, or citation to the pages of the record on appeal indicating they presented actual argument in the trial court and thus preserved the issue for appeal. As an example, in its opening brief for the Loftominium action, the plaintiff states, "the relationship between [the parent corporation] and the condominium associations, upon which defendants' position completely depends, is unsupported by any evidentiary matter, and does not in fact exist." Instead of next citing authority on the evidentiary standard and applying it to the evidence presented, the plaintiff skips to whether a relationship exists between the current owner-elected condominium associations and the parent corporation. Similarly, in its opening brief about the Gold Coast Galleria disqualification, the plaintiff states "the trial court deprived plaintiff of its choice of counsel based upon unfounded factual assertions that defendants did not even attempt to support by affidavit, corporate records or any other evidentiary matter," yet the plaintiff provides no

1-06-0104 and 1-06-1179, cons.

reasoned argument or legal authority indicating an affidavit or corporate records were necessary, and no citation to the record indicating the plaintiff provided reasoning and authority to the trial court. We will not address the merits of the plaintiffs' frequent but fleeting comments regarding the evidence. Issues not presented to or considered by the trial court are waived on appeal (*In re Estate of Vallerius*, 253 Ill. App. 3d 226, 229-30, 230, 624 N.E.2d 459, 462 (1993)), and appellate contentions which are not supported by legal reasoning, citation to authority and citation to the pertinent pages of record are waived on appeal and shall not be raised in a reply brief or a petition for rehearing. 188 Ill. 2d R. 341. We find that even if the issue was adequately presented in the trial court, it was not adequately presented in this forum. Thus, any question as to whether the evidence was sufficient has been waived and the facts are not in dispute. We derive the following, relevant facts primarily from the written opinion which Judge Duncan-Brice issued in the Loftominium action.

Arnstein provided legal assistance to a group of related corporations between 1999 and attorney Sugar's association with Arnstein in March 2005, as follows.

First, Ambelos Corporation (Ambelos), which is a holding company with numerous subsidiary and affiliated corporations which have developed residential condominium properties in Chicago, retained Arnstein on August 2, 2004, to represent the corporation before the collections division of the Internal Revenue Service. Nicholas S. Gouletas, who was named as a defendant in the Loftominium suit, is the sole shareholder of Ambelos and is Ambelos' president and only director. Steven E. Gouletas, who was named as a defendant in both the Gold Coast Galleria and the Loftominium suits, is the corporation's vice president. Anthony R. DiBenedetto, who was

5

named as a defendant in the Loftominium suit, is the corporation's secretary. James Schwark, who was named as defendant in the Loftominium suit, is the corporation's treasurer.

Second, Chestnut Street Holdings, LLC (which is a member and the manager of 111 East Chestnut Consultants, Inc.), and 111 East Chestnut Garage Condominium Association were represented by Arnstein in 1999-2000 litigation with American Freehold where Sugar represented the party suing 111 East Chestnut Garage Condominium Association. In addition, the Chestnut corporations were represented by Arnstein in 2004 contract negotiations with Golf Construction. Nicholas S. Gouletas, Steven E. Gouletas, and Nicholas V. Gouletas were the corporation's directors, until the latter man resigned his post on February 12, 2004. Steven E. Gouletas is the president, Anthony DiBenedetto is the secretary, and James Schwark is the treasurer.

Third, the Sterling Private Residences Condominium Association was represented by Arnstein from December 1, 2004, until at least March 23, 2005, in litigation by unit owners, against unit owners, and on foreclosure actions. We note that according to the plaintiffs, Arnstein's representation of Sterling Private Residences dates even further back, to December 2003, and the firm considers the condominium association to be a current client. The corporate directors and officers include: defendant Nicholas S. Gouletas, director and treasurer; defendant Steven E. Gouletas, director and president; and defendant Nicholas V. Gouletas, who served as director and secretary until he resigned on February 12, 2004.

Fourth, Millennium Centre Condominium Association/The Residences at Millennium Centre were represented by Arnstein in 2004-to-2005 billing and collection matters, and Arnstein's invoices reflect representation spanning from December 18, 2003, to at least March

23, 2005. Moreover, according to the plaintiffs, Arnstein's representation of The Residences at Millennium Centre dates back to December 2003, and the condominium association is a current client. The corporate officers and directors include defendant Nicholas S. Gouletas, director and treasurer; defendant Steven E. Gouletas, director and president; and defendant Nicholas V. Gouletas, director and secretary, until he resigned from the posts on February 12, 2004.

Fifth, River City Condominium Association was represented by Arnstein from December 3, 2003 through at least March 31, 2005 in billing and collection matters. The plaintiffs admit that Arnstein's representation of this entity actually dates back as far as November 2002. The corporate officers and directors include defendant Nicholas S. Gouletas, director and treasurer; defendant Steven E. Gouletas, director and president; and defendant Nicholas V. Gouletas, director and secretary until he resigned on February 12, 2004.

Sixth, River City Marina Condominium Association was represented by Arnstein from November 11, 2002, through at least March 31, 2005, in billing and collection matters. The corporate officers and directors include defendant Nicholas S. Gouletas, director and treasurer; defendant Steven E. Gouletas, director and president; and defendant Nicholas V. Gouletas, director and secretary until he resigned on February 12, 2004.

Seventh, Delaware Place Private Residences Condominium Association was represented by Arnstein in 2004-to-2005 billing and collection matters. According to the plaintiffs, Arnstein's representation of Delaware Place Private Residences dates back to August 2004. The corporate officers and directors include defendant Nicholas S. Gouletas, director and treasurer; defendant Steven E. Gouletas, director and president; and defendant Nicholas V. Gouletas, director and

1-06-0104 and 1-06-1179, cons.

secretary until he resigned on February 12, 2004.

Judge Duncan-Brice's recitation of these facts was based in part on an *in camera* review of invoices and documents which Arnstein issued between 1999 and 2005. In her written opinion, the judge summarized that the 263 billing invoices Arnstein submitted reflected representation in at least 60 matters, involved 15 billing professionals, and totaled $175, 388.30 in fees.

The record also discloses that parent corporation Ambelos indirectly owns 100% of the corporation that is defending the Loftominium action, Wabash Loftominium, LLC. Ambelos also indirectly owns 100% of A.P. Loftominium Consultants, which is the corporation that manages defendant Wabash Loftominium, LLC. As stated above, defendant Nicholas V. Gouletas is the sole shareholder of Ambelos. The corporate officers of defendant Wabash Loftominium, LLC, are Steven E. Gouletas, Anthony R. DiBenedetto, James Schwark, Nicholas V. Gouletas, and Nicholas S. Gouletas. The corporate officers of manager A.P. Loftominium Consultants, Inc., include Steven E. Gouletas, president; Anthony R. DiBenedeto, secretary, and James Schwark, treasurer.

Also pertinent with respect to the Gold Coast Galleria action is the fact that Ambelos owns Home by Invsco; Homes by Invsco owns Galleria Residential Consultants, Inc. and Galleria Residential Members, LLC; and Galleria Residential Consultants, Inc., and Galleria Residential Members, LLC own defendant Galleria Residential L.L.C. In short, Ambelos indirectly owns the corporation defending the Gold Coast Galleria action.

As indicated above in conjunction with the motion to strike the Loftominium brief's Statement of Facts, there was a third lawsuit in which Arnstein represented the plaintiff

8

condominium board and the defendants named included Steven E. Gouletas, Anthony R. DiBenedetto, James Schwark, and Nicholas V. Glouetas. According to the defendants, during a April 4, 2005, status hearing for that matter, they raised the issue of Arnstein's conflict of interest. Arnstein does not deny this recollection, but contends that it was its routine screening efforts on April 18, 2005, that alerted it to a possible conflict and that this potential was immediately dealt with by an internal memorandum. In an affidavit filed in opposition to the Loftominium motion to disqualify, Arnstein partner Arthur L. Klein stated that he chairs the firm's professional responsibility committee and is responsible for addressing possible conflicts of interest involving prospective and actual clients. Further, on or about April 18, 2005, Klein became aware through the firm's regular conflict screening procedures that Sugar was involved in the Gold Coast Galleria and Loftominium actions, and that other Arnstein attorneys may have represented entities affiliated with the defendants to those actions. Accordingly, Klein immediately issued a screening memorandum indicating attorneys Cichocki, Goldberg, Lach, McKenzie, and Swibel "must be isolated from all confidences, secrets and material knowledge concerning [the two lawsuits]," must not have contact with the plaintiff-clients, and must not discuss any aspect of the two lawsuits with other attorneys at the firm. Klein specified that he issued the screening memorandum as a matter of course and that he was not aware the defendants were raising the conflict of interest issue.

After considering the parties' written briefs and oral arguments, Judge Duncan-Brice concluded Arnstein was in a long-term, significant relationship with the Ambelos corporations and was actively representing some of those corporations concurrently or after Arnstein substituted as

counsel in the Loftominium action. She emphasized that the management group for the existing clients, the management group for the current corporate defendant, and the current individual defendants were substantially the same. Due to the shared management group, Arnstein was required to consider all of the Ambelos-affiliated entities as its clients, and to obtain the defendants' permission before accepting the Loftominium plaintiff as a client. By failing to disclose its intentions and obtain the prior permission of the defendants, Arnstein violated Rule 1.7. 134 Ill. 2d R. 1.7. After Judge Duncan-Brice issued her ruling on December 14, 2005, the defendants asked Arnstein to voluntarily withdraw from the Gold Coast Galleria action, but Arnstein declined to do so. A round of briefing and oral arguments ensued, which led Judge Burke to determine that, given the shared management group, the logic applied in the Loftominium action was equally applicable in the Gold Coast Galleria case. Judge Burke granted the motion to disqualify on April 18, 2006, and this consolidated appeal followed.

Because Rule 1.7 was the basis of the disqualification motions and orders, we will first address the disqualification in terms of Rule 1.7, rather than the rule the plaintiffs contend is pertinent, Rule 1.9. 134 Ill. 2d Rs. 1.7, 1.9. Neither the parties nor we, in our own research, have identified any Illinois case involving the same or a similar facts; however, in a previous opinion, this court noted that the rationale of *Guillen v. City of Chicago*, 956 F. Supp. 1416 (N.D. Ill. 1997), is instructive on the standard applicable to the review of a Rule 1.7 disqualification. *In re Possession & Control of the Commissioner of Banks & Real Estate of Independent Trust Corp.*, 327 Ill. App. 3d 441, 478, 764 N.E.2d 66, 99 (2001) ("Although *Guillen* addressed Disciplinary Rule 5-105(B) [citation], we do not believe there is a substantial

10

difference between that rule and Rule 1.7 because both rules are comparable in purpose and design"); 134 Ill. 2d R. 1.7.

According to *Guillen*, on the one hand, disqualification will protect the attorney-client relationship by ensuring that clients receive the undivided loyalty of their legal representative. *Guillen*, 956 F. Supp. at 1421. On the other hand, it is well-settled that disqualification is "a drastic measure which courts should hesitate to impose" unless absolutely necessary. *Guillen*, 956 F. Supp. at 1421. In addition to delaying the proceedings, disqualification will deprive a party of his chosen legal advisor. *Guillen*, 956 F. Supp. at 1421. Furthermore, disqualification requests should be viewed " 'with extreme caution for they can be misused as techniques of harassment.' " *Guillen*, 956 F. Supp. at 1421, quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982). Therefore:

> "'[The court] considers the right of a party to select counsel of his
> choice to be a matter of significant importance, which will not be
> disturbed unless a specifically identifiable impropriety *has occurred*.
> A disqualification order discredits the bar generally and the
> individual attorneys particularly. Thus, while there can be no
> hesitation to disqualify where impropriety *has occurred* . . . judges
> must exercise caution not to paint with a broad brush stroke under
> the misguided belief that coming down on the side of
> disqualification raises the standard of legal ethics and the public's
> respect. The opposite effects are just as likely -- encouragement of

1-06-0104 and 1-06-1179, cons.

> vexatious tactics and increased cynicism by the public.' [Citation.]*"
>
> *Guillen*, 856 F. Supp. at 1421, quoting *Panduit Corp. v. All States*
>
> *Plastic Manufacturing Co.*, 744 F.2d. 1564, 1576-77 (Fed. Cir.
>
> 1984).

The plaintiffs' first argument is that the disqualification orders should be reversed because corporations are distinct entities for purposes of conflict of interest analysis and Arnstein has never represented any of the current corporate or individual defendants. The plaintiffs base this argument in part on an Illinois State Bar Association ("ISBA") advisory opinion indicating that the Rules of Professional Conduct generally permit a lawyer to undertake representation adverse to a subsidiary or affiliate of an existing corporate client. ISBA Op. No. 95-15 (May 17, 1996). The plaintiffs also rely on *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817, 831, 413 N.E.2d 1299, 1310 (1980), which indicates "an attorney for a corporate client owes his duty [of loyalty] to the corporate entity rather than a particular officer, director, or shareholder." The plaintiffs contend that although Judge Duncan-Brice cited the ISBA advisory opinion in her written disqualification order, she erroneously reached "precisely the opposite *** conclusion."

The plaintiffs' argument, however, disregards the stated exceptions to this general rule. The ISBA specified:

> "[T]here may well be particular circumstances that would require
>
> the lawyer to consider a subsidiary or other constituent of a
>
> *corporate client to be a client of the lawyer as well.* Such

12

1-06-0104 and 1-06-1179, cons.

> instances could include, for example, situations where the lawyer's
> work for a corporate parent involves direct contact with its
> subsidiaries and the receipt of [confidential or secret] information
> concerning the subsidiaries *** or *situations where the client
> corporation and the subsidiary [or other constituent] in question
> have the same management group.* Another situation that would
> require the lawyer to treat a corporate affiliate as a client is where
> one entity could be considered the alter ego of the other."
> (Emphasis added.) ISBA Op. No. 95-15, slip op. at 4 (May 17,
> 1996).

The record shows that although Arnstein has literally never represented defendant Wabash Loftominium, L.L.C., defendant Galleria Residential, L.L.C., or the individual defendants as individuals, Arnstein has been representing corporations that are related to the corporate defendants and are run by substantially the same management group consisting of the individual defendants. The plaintiffs contend the "same management group" exception is not relevant here because "defendants have not even identified any of the officers and directors Wabash, let alone demonstrated that they are the same as those of any other entity." This contention is factually inaccurate, however, as the record demonstrates that all of the individual defendants were and are officers of A.P. Loftominium Consultants, Inc., which is the member-manager of defendant Wabash, and that both corporations are affiliated with Ambelos. Defendant Steven E. Gouletas is president of A.P. Loftominium Consultants, Inc., and vice president of Ambelos. Defendant

13

1-06-0104 and 1-06-1179, cons.

Anthony R. DiBenedetto is the secretary of A.P. Loftominium Consultants, Inc., and secretary of Ambelos. Defendant James Schwark is treasurer of A.P. Loftominium Consultants, Inc., and treasurer of Ambelos. Defendant Nicholas S. Gouletas is the sole shareholder of Ambelos, and Ambelos indirectly owns 100% of defendant Wabash and A.P. Loftominium. The record also shows Arnstein has represented this management group between 1999 and 2005 in at least 60 different matters, involving the services of 15 billing professionals, and generating $175,388.30 in fees.

The plaintiffs argue the ISBA advisory opinion is "not authority" and that we should instead look to a California opinion indicating that "only in those limited [instances] where one corporation is the alter ego of the other should parent and subsidiary corporations be treated as the same entity for conflict purposes." *Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court*, 60 Cal. App. 4th 248, 253, 70 Cal. Rptr 2d 419, 422 (1997). We acknowledge that the ISBA opinion is merely persuasive, nonbinding authority; however, it is not unprecedented for our courts to find guidance in the opinions of our organized bar. See, *e.g., First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 364, 688 N.E.2d 1179, 1185 (1997) (citing ISBA opinion with approval even though "opinions of the organized bar are merely advisory and are not binding on the courts"); *Stevens v. Rooks Pitts & Poust*, 289 Ill. App. 3d 991, 998-99, 682 N.E.2d 1125, 1131-32 (1997) (also citing ISBA opinions). Furthermore, the California opinion cited by the plaintiffs suffers from the same drawback of being merely persuasive, nonbinding authority. *Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 239, 569 N.E.2d 55, 61 (1991) (indicating the

decisions of reviewing courts of foreign jurisdictions are not binding on Illinois courts). More importantly, the California opinion does not address the same management group exception, which is the second of the three exceptions set out in the ISBA opinion. Rather, it addresses the alter ego exception, and chooses that exception over the unity of interests exception employed by its trial court. *Brooklyn Navy Yard*, 60 Cal. App. 4th at 258, 70 Cal. Rptr. 2d at 425. Thus, *Brooklyn Navy Yard* is not pertinent here. *Brooklyn Navy Yard*, 60 Cal. App. 4th at 258, 70 Cal. Rptr. 2d at 425. We also point out that its strict adoption of the alter ego test has been discredited by a more recent California opinion indicating the court's analysis conflicts with the American Bar Association ("ABA") ethics opinion it relies upon. *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 244, 81 Cal. Rptr. 2d 425, 438 (1999). The underlying ABA ethics opinion states that whether Rule 1.7 is triggered "depends not upon any clearcut *per se* rule but rather upon the particular circumstances." ABA Formal Op. 95-390 (January 25, 1995). Further:

> "Even if the subject matter of the lawyer's representation of the corporate client does not involve the affiliate at all, *** the lawyer's relationship with the corporate affiliate may lead the affiliate reasonably to believe that it is a client of the lawyer. For example, the fact that a lawyer for a subsidiary was engaged by and reports to an officer or general counsel for its parent may support the inference that the corporate parent reasonably expects to be treated as a client." ABA Formal Op. 95-390, slip op. at 1001:264

15

1-06-0104 and 1-06-1179, cons.

(January 25, 1995).

The particular circumstances of this case indicate Arnstein was engaged by and reports to a management group that runs parent, subsidiary, and affiliated corporations that own, manage, and develop residential condominium properties in Chicago. The particular circumstances of this case would lead the management group and the Ambelos corporations to reasonably believe they were Arnstein's existing clients. "If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved." *SWS Financial Fund A v. Salomon Brothers, Inc.*, 790 F. Supp. 1392, 1398 (N.D. Ill. 1992). However, "[i]f a lawyer has served a client over a substantial period in a variety of matters, the client may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal." (Emphasis omitted.) *SWS Financial Fund A*, 790 F. Supp. at 1398. Under the circumstances presented, "the lawyer would be required to seek the corporate client's consent, with appropriate disclosure, before accepting a representation adverse to the affiliate." ISBA Op. No. 95-15, slip op. at 4 (May 17, 1996). Significantly, there is no indication that Arnstein took any affirmative action to inform the Ambelos management group that it was ending their long-term attorney-client relationship regarding the ownership, management, and development of residential condominium properties in Chicago. Moreover, any "[d]oubt about whether a client-lawyer relationship [exists] should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so." *SWS Financial Fund A*, 790 F.Supp. at 1398. There is no provision in Rule 1.7 for an internal screening memorandum such as the one issued by Arthur L. Klein to take the place of affirmative

16

disclosure and informed consent.  134 Ill. 2d R. 1.7.

The plaintiffs' second main argument is that Arnstein provided merely limited representation to a few of the Ambelos corporations, instead of forming a long-term relationship with the group of companies run by the same group of people and, thus, Rule 1.9 is the more pertinent rule.  The plaintiffs focus on the services Arnstein provided to Ambelos in an Internal Revenue Service matter that ended in 2004, to Chestnut Street Holdings in litigation that ended in 2000, and to Chestnut Street Holdings in "a single instance of advice relating to contract negotiations with a particular construction company in 2004."  The plaintiffs acknowledge that Arnstein has an ongoing relationship with the five condominium associations:  Sterling Private Residences, Residences at Millennium Centre, River City Private Residences, River City Marina, and Delaware Place Private Residences, but contends those entities may be disregarded because they are not "subsidiaries" of Ambelos or any other corporation, because they were formed pursuant to the Illinois Condominium Property Act (765 ILCS 605/18.01 (West 2002)) by the condominium unit owners or the condominium board.  They also argue there is no factual support for the trial court's determination that the corporations share the same management group, because "defendants did not offer a shred of evidence to support their assertions on that point."

As we noted above, however, any attack on the sufficiency of the evidence has been waived on appeal and will not be analyzed.  In addition, although the condominium associations may not be deemed "subsidiaries" of Ambelos, the record shows they are closely related to Ambelos.  The attempt to minimize the nature of the attorney-client relationship by focusing on specific assignments from Ambelos in 2004 and Chestnut Street Holdings in 2000 and 2004 is not

17

persuasive in light of the extensive representation of corporations having a common management group. An instructive case in this regard is *International Business Machines Corp. v. Levin*, 579 F.2d 271 (3d Cir. 1978), where, in the context of reviewing a disqualification order due to a present attorney-client relationship, it was stated:

> "The court found as a fact that at all relevant times [the subject law firm] had an on-going attorney-client relationship with both [its client] and the plaintiffs. This assessment of the relationship seems entirely reasonable to us. Although [the law firm] had no specific assignment from [the client] on the day the antitrust complaint was filed and even though [the law firm] performed services [for the client] on a fee for service basis rather than pursuant to a retainer agreement, the pattern of repeated retainers, both before and after the filing of the complaint, supports the finding of a continuous relationship." *International Business Machines Corp.*, 579 F.2d at 281.

Similarly, in *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 194 (1989), the court rejected the law firm's argument that its relationship with its client was over, stating, "[The subject law firm's] relationship with [its client] *** was sufficiently continuous, and the mere fortuity that [the client] did not require more extensive or frequent services than he did cannot be the escape hatch [the law firm] would have it be." The billing invoices in this case disclosed a sufficiently continuous representation over the course of seven years involving at least 60 matters,

1-06-0104 and 1-06-1179, cons.

and 15 billing professionals that garnered $175, 388.30 in fees. Accordingly, we will not analyze the merits of the disqualification pursuant to Rule 1.9, which is the rule regarding former clients. 134 Ill. 2d R. 1.9.

We are not persuaded by Arnstein's citation to *People v. Wos*, 395 Ill. 172, 69 N.E.2d 858 (1946), or *Allord v. Municipal Officers Electoral Board for the Village of South Chicago Heights*, 288 Ill. App. 3d 897, 682 N.E.2d 125 (1997), because those cases merely state the general proposition that when an attorney is retained to complete a special task, the employment ends upon completion of the task. In the first case, counsel was retained to defend the accused in criminal court and it was presumed the relationship of attorney and client terminated when the defendant was committed to the penitentiary. *Wos*, 395 Ill. at 178, 69 N.E.2d at 861. In the second case, the attorney was retained to represent a group of election candidates in an administrative proceeding and there was no indication he was their attorney when the challenger filed a new petition in the circuit court. *Allord*, 288 Ill. App. 3d at 902, 692 N.E.2d at 129. Both cases involve discrete tasks and are distinguishable from the present case.

The plaintiffs' final argument with respect to the Loftominium action is that the defendants waived the right to complain of the conflict of interest by not promptly motioning for disqualification. The plaintiffs are not arguing that waiver occurred in the Gold Coast Galleria action. More specifically, the plaintiffs contend the Loftominium defendants "threatened to bring this motion as early as April 26, 2005, over six months before it was finally filed, but repeatedly failed to do so." The record on appeal shows status hearings were conducted at least once a month, and that at each court date, Judge Duncan-Brice would establish a new briefing schedule

19

1-06-0104 and 1-06-1179, cons.

for the disqualification motion. The plaintiffs point out that Judge Duncan-Brice imposed a final filing deadline of October 14, 2005, and when the motion was presented for filing *instanter* on October 21, 2005, Judge Duncan-Brice heard the motion and granted it on October 28, 2005. The plaintiffs conclude the "long delay" and lack of merit demonstrates the motion was intended to be harassing and that Judge Duncan-Brice "completely failed" to address this fact.

The defendants respond that they immediately brought the issue to the law firm's attention (during the April 4, 2005, status hearing conducted in the action that is not on appeal, No. 02-L-14549, Board of Directors of the Elm at Clark Condominium Association v. 1122 North Clark, L.L.C., Steven E. Gouletas, Anthony R. DiBenedetto, James Schwark, and Nicholas V. Glouetas), and then requested extensions to the briefing schedule while they were reviewing Arnstein's invoices in order to comprehend the extent of Arnstein's prior representation. In addition, the defendants' attorneys changed law firms in late August 2005 and did not have access to the client files for two months. The defendants also note that the written disqualification order includes an extensive summary of the arguments regarding waiver and, thus, demonstrates the judge's understanding and rejection of Arnstein's position, rather than a "complete[] fail[ure]" to consider its concern.

We reject the waiver argument because the plaintiffs' characterization of the proceedings is not accurate and the case law it relies upon is distinguishable. The record demonstrates that the question of conflict was raised in April 2005, immediately after attorney Sugar became associated with Arnstein, and that the issue continued to be a prominent subject during the next six or seven months of status hearings, while the defendants researched and prepared the motion to disqualify.

20

1-06-0104 and 1-06-1179, cons.

The fact that the motion was accompanied by 865 pages of invoices which Arnstein had issued to Ambelos and its related corporations between 1999 and 2005 bears out the defendants' contention that the motion required time-consuming research into the factual basis for the motion. Moreover, there is no indication that the plaintiff was prejudiced when the briefing schedule was extended for two additional months because the defense attorneys could not access the relevant historical files immediately after they joined a different law firm. The circumstances indicate the disqualification motion was brought with reasonable promptness, unlike the cases Arnstein is relying upon, such as *Nuccio v. Chicago Commodities, Inc.*, 257 Ill. App. 3d 437, 441, 628 N.E.2d 1134, 1137 (1993), in which the party claiming conflict was silent during six years of proceedings which included a discovery deposition, an administrative hearing, and mandatory arbitration. The court indicated the party waived any issue with regard to conflict by failing to bring the motion to disqualify "as soon as practical" and that disqualification so late in the proceedings would "unfairly prejudice[]" the opponent. *Nuccio*, 257 Ill. App. 3d at 442, 628 N.E.2d at 1138. Similarly, in *International Insurance Co. v. City of Chicago Heights*, 268 Ill. App. 3d 289, 303, 643 N.E.2d 1305, 1314 (1994), the moving party was silent for more than a year and the circumstances suggested it had acquiesced to internal screening procedures it had discussed with the law firm. In *Tanner v. Board of Trustees of the University of Illinois*, 121 Ill. App. 3d 139, 146, 459 N.E.2d 324, 329 (1984), the motion to disqualify was presented just before an evidentiary hearing, rather than at a pretrial conference conducted six weeks earlier. It cannot be seriously contended here that the moving party was lax or silent during years of substantive proceedings. The motion came early in the proceedings rather than as an

21

afterthought. The plaintiffs offer only the vague suggestion that although the conflict issue was consistently discussed at the status hearings conducted between April and October 2005, Arnstein was investing "substantial time and expense *** in this case." There is no similarity between the facts of this case and the case law which the plaintiffs bring to our attention.

The plaintiffs' arguments do not persuade us that the trial judges abused their discretion when they entered the disqualification orders on appeal. We affirm those orders.

Affirmed; Motion taken with the case granted in part and not considered in part.

CAHILL and GARCIA, JJ., concur.