Richard WATKINS, Plaintiff-Appellee,

v.

TRANS UNION, LLC, Defendant-Appellant.

No. 17-1142

United States Court of Appeals, Seventh Circuit.

Argued May 31, 2017

Decided August 22, 2017

Rehearing and Rehearing En Banc Denied September 27, 2017

516

Before KANNE, SYKES, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

Plaintiff Richard Watkins has sued Trans Union for violating the Fair Credit Reporting Act. The merits of his claims are not the subject of this· appeal. The issue here is whether attorney John Cento should be disqualified from representing Watkins. That is ·because over ten years ago Cento earned a living defending Trans Union in hundreds of lawsuits alleging Fair Credit Reporting ·Act violations. Because the Southern District of Indiana makes use of Indiana's rules governing

attorney conduct, Indiana Rule of Professional Conduct 1.9 (Duties' to Former Clients) governs Trans Union's effort to have Cento disqualified.

The district court found that Rule 1.9 does not require Cento's disqualification, but the court authorized an interlocutory appeal of that decision·under 28 U.S.C. § 1292(b), which we accepted. Trans Union argues that the district court applied the· wrong legal standard to decide disqualification and misapplied the standard that it did apply. We disagree and affirm the decision of the district court. Because this case turns on the trajectory of Cento's legal career, we begin there. We then review the facts and procedural history of Watkins's case before reviewing the district court's reasons for denying disqualification under Rule 1.9.

## I. Factual and Procedural History

### A. John Cento's Legal Career

John Cento began his career as an attorney at the Indianapolis law firm of Katz & Korin, P.C., where he worked with Robert Schuckit. Trans Union was a client first of Schuckit, and then Katz & Korin when Schuckit joined the firm. Cento began representing Trans Union in 2001, and between 2003 and 2005 worked almost exclusively on Trans Union cases. Schuckit then left Katz & Korin in June 2005 to form his own law firm. Cento followed, but he stayed with Schuckit's new firm for just a month.

Almost all of the cases in which Cento represented Trans Union involved the Fair Credit Reporting Act (FCRA). The FCRA imposes a duty to maintain reasonable procedures for accurate reporting. See 15 U.S.C. § 1681e(b).· The Act authorizes a private cause of action for consumers against consumer reporting agencies· such as Trans Union for willful, knowing, or

negligent failures to comply with the law. 15 U.S.C. §§ 1681n–p. A defendant may avoid liability for violations that occur despite the defendant's good-faith effort to comply with the law. See, e.g., 15 U.S.C. §§ 1681g(e)(5), (7).

Cento defended Trans Union against those claims of FCRA violations for five years. Between 2001 and 2005, he represented Trans Union in over 250 cases and billed over 4,000 hours of work for Trans Union. He worked with Trans Union's in-house counsel and employees, and he was given access to any information necessary for litigation. Today, twelve years after Cento last represented Trans Union, Schuckit and his firm continue to represent Trans Union. Some of the Trans Union employees with whom Cento worked remain with the company.

In 2013, Cento formed Cento Law, which represents consumers bringing FCRA violation claims against credit reporting agencies. The law firm advertises the experience of its attorneys on its webpage: "Our credit report attorneys have litigated hundreds of Fair Credit Reporting Act cases across the country. Our experience in this area of law is derived not only from representing consumers, but from years of prior representation of two of the three national consumer reporting agencies, Trans Union and Equifax." Cento Law, http://www.centolaw.com (last visited Aug. 21, 2017). In 2012, and again in 2013, Cento was disqualified from cases in which he represented plaintiffs who brought claims against his former client, Trans Union. *Childress v. Trans Union, LLC* (*Childress I*), No. 1:12-CV-00184-TWP-DML, 2012 WL 6728339 (S.D. Ind. Dec. 28, 2012); *Hobson v. Trans Union, LLC*, No. 1:13-CV-54, 2013 WL 2443917 (N.D. Ind. June 5, 2013).

B. *The Watkins Litigation*

In the present case, Richard Watkins selected Cento to represent him in his case alleging FCRA violations against Trans Union under 15 U.S.C. §§ 1681e, 1681g, and 1681i. Watkins had applied for a loan in 2009 and discovered that his Trans Union credit file contained twenty "collection tradelines" that were not his. He disputed the accuracy of his credit file, and Trans Union removed the incorrectly attributed collections. But when Watkins applied for a mortgage in 2013, he learned that the collections had once again been placed in his credit file. The problem, Watkins alleges, is that Trans Union's algorithms have resulted in the merging or mixing of Watkins's credit file with that of another person to create a "mixed file," and that Trans Union has failed to remedy the continued inclusion of collections not belonging to Watkins. The merits of Watkins' claims will turn on whether the procedures Trans Union used "reasonable procedures to assure maximum possible accuracy" of the information about Watkins, see 15 U.S.C. § 1681e(b), and whether Trans Union made good-faith efforts to comply with the law, § 1681g(e)(5) & (e)(7).

Cento filed Watkins's complaint in May 2014. One month later, Trans Union filed a motion to order Cento to show cause why he should not be disqualified as Watkins' lawyer. *Watkins v. Trans Union, LLC*, No. 2:14-cv-135-WTL-DKL, 2016 WL 4919999, at *1 (S.D. Ind. Sept. 15, 2016). The district court granted that motion and permitted Cento to seek limited discovery to aid in showing cause. *Id.* This was an unusual procedural path for seeking attorney disqualification. Rather than file a motion to disqualify, Trans Union sought a show-cause order in reliance on the cases in which Trans Union had successfully sought disqualification against Cento in the past. *Id.*; see also *Childress I*, 2012 WL

6728339; *Hobson*, 2013 WL 2443917. The discovery process that followed the show-cause order resulted in a magistrate judge report with three alternate recommendations (to hold an evidentiary hearing; to decline to disqualify; or, alternatively, to disqualify), but Judge Lawrence, to whom the case was reassigned after the magistrate proceedings, decided to "exercise [the court's] authority to begin with a clean slate." *Watkins*, 2016 WL 4919999, at *2. The parties briefed the attorney disqualification issue and the court held a hearing before issuing its decision. *Id.* at *1.

In the district court, as on appeal, Trans Union relied on *LaSalle National Bank v. Lake County*, 703 F.2d 252 (7th Cir. 1983), and *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir. 1983), to argue that federal common law governs the standard for disqualification. Both cases predate Indiana Rule of Professional Conduct 1.9, which, as the district court found here, governs the issue of disqualification. After analyzing the precedents and the history of the adoption of the Rules of Professional Conduct, Judge Lawrence followed the guidance of Rule 1.9 rather than *LaSalle National Bank* or *Analytica* and held that Cento should not be disqualified. *Watkins*, 2016 WL 4919999, at *6. The prior representations are not factually related such that the same matter is in dispute in *Watkins*. Nor, the judge found, is there a risk that confidential information from the prior matters would materially advance Watkins' present claims. *Id.* at *4–6. Moreover, the judge noted, over a decade has passed since Cento represented Trans Union. *Id.* at *6. Accordingly, the judge held that the requirements for disqualification were not met. He permitted Cento to continue representing Watkins. *Id.*

In this interlocutory appeal under 28 U.S.C. § 1292(b), Trans Union argues that the district court applied the wrong legal standard for attorney disqualification and misapplied the standard it chose. We affirm the decision of the district court.

## II. *Analysis*

We review for abuse of discretion the district court decision rejecting disqualification. *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993); *Whiting Corp. v. White Machinery Corp.*, 567 F.2d 713, 715 (7th Cir. 1977) (the district court "possesses broad discretion in determining whether disqualification is required in a particular case...."), quoting *Schoetter v. Railoc. of Ind., Inc.*, 546 F.2d 706, 710 (7th Cir. 1976). An abuse of discretion can be shown when the district court based its decision on an erroneous view of the law or a clearly erroneous evaluation of evidence. See, e.g., *Novo Terapeutisk Lab. A/S v. Baxter Travenol Lab., Inc.*, 607 F.2d 186, 188–89 (7th Cir. 1979) ("This court has relied on the broad discretion of the district court in refusing to disturb a disqualification order, but we have not allowed a strict standard of review to prevent reversal when the district court predicated its disqualification ruling on a misunderstanding of the law.") (citations omitted). This standard of review is consistent with other areas of law in which district judges have discretion but in exercising it must apply the correct rule of law. See, e.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) ("district court would necessarily abuse its discretion [in deciding Rule 11 sanctions motion] if it based its ruling on an erroneous view of the law"); *Ervin v. OS Restaurant Services, Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (application of incorrect legal rule to decide class certification would amount to abuse of discretion).

■ We have observed that granting a motion for disqualification has "immediate, severe, and often irreparable ... consequences" for the party and disqualified attorney. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 719 (1982). Disqualifying a lawyer immediately deprives the losing party from the "representation of his choice" and disrupts the litigation. *Id.* In sum, "disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary ... [because it] destroy[s] a relationship by depriving a party of representation of their own choosing." *Id.* at 721.

■ However, the duty of confidentiality represented in the Rules of Professional Conduct, like the Code of Professional Responsibility that came before them, is fundamental to the profession and the relationship between lawyer and client. See *id.* Courts have a duty to safeguard the privacy of the attorney-client relationship and in doing so to "maintain public confidence in the legal profession" and to protect "the integrity of the judicial proceeding." *Id.*

■ Whether disqualification is appropriate in this case is governed by the Indiana Rules of Professional Conduct. Lawyers representing clients in federal courts must follow federal rules, but most "federal courts use the ethical rules of the states in which they sit." *Huusko v. Jenkins*, 556 F.3d 633, 636 (7th Cir. 2009). Watkins filed suit in the Southern District of Indiana, which has adopted the Indiana Rules of Professional Conduct to govern attorneys' conduct. S.D. Ind. Local Rule 83-5(e). Indiana adopted the ABA Model Rules of Professional Conduct as its Rules of Professional Conduct in 1987. *United States v. Goot*, 894 F.2d 231, 234 (7th Cir. 1990). Rule 1.9 governs the duties lawyers owe to former clients and thus whether Cento should be disqualified from representing Watkins because of a duty he may owe to his former client, Trans Union.[1]

### A. Indiana Rule of Professional Conduct 1.9

Indiana Rule of Professional Conduct 1.9 mirrors the A.B.A. Model Rule of the same number and reads, in relevant part:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

■ In interpreting the Rules of Professional Conduct, federal courts may rely on the specific guidance offered in the commentary. See *Nix v. Whiteside*, 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Williams*, 698 F.3d 374, 386 (7th Cir. 2012) (Hamilton, J., dissenting in part) (commentary to A.B.A. standards governing norms of legal prac-

---

1. Special considerations apply to federal government lawyers but are not implicated here. See, e.g., *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 893, 929–30 (10th Cir. 2016) (holding that a New Mexico Rule of Professional Conduct as applied in part to federal prosecutors violated Supremacy Clause), *petition for cert. filed*, No. 16-1450 (June 5, 2017). The McDade Act requires that an "attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B. However, the Act "should not be construed in any way to alter federal substantive, procedural, or evidentiary law...." 28 C.F.R. § 77.1(b).

tice can be "valuable guidance"). The commentary to Rule 1.9 defines two matters as "substantially related" when two matters "involve the same transaction or legal dispute," or when there is a "substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Ind. R. Prof'l Conduct 1.9, cmt. 3.

■ Whether two matters "involve the same transaction" is determined by an inquiry into whether the matters are factually related. Comment 2 states: "The scope of a 'matter' for purposes of this Rule depends on the facts of a particular situation or transaction." It is the direct involvement "in a specific transaction," that makes "subsequent representation of other clients with materially adverse interests in that transaction clearly ... prohibited." *Id.*, cmt. 2.

■ If the prior and present matters do not involve the same transaction or legal dispute, they may still be substantially related if there is a substantial risk that confidential information would materially advance the client's position in the present matter. The commentary tells us that information "disclosed to the public or to other parties adverse to the former client ordinary will not be disqualifying," and that information "acquired in a prior representation may have been rendered obsolete by the passage of time." *Id.*, cmt. 3.

On the issue most pertinent to this case, the commentary explains that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." *Id.*, cmt. 2. "In the case of an organizational client, general knowledge of

the client's policies and practices ordinarily will not preclude a subsequent representation." *Id.*, cmt. 3.

Rule 1.9 clarified and narrowed the contours of an older federal common-law rule for attorney disqualification referred to as the "substantial relationship test." The Model Rules of Professional Conduct, of which Rule 1.9 is a part, replaced the Model Code of Professional Conduct, which was based on canons first promulgated in 1908. Monroe Freedman, *The Kutak Model Rules v. The American Lawyer's Code of Conduct*, 26 Vill. L. Rev. 1165 (1981); Kathleen Maher, *Keeping Up Appearances*, 16 Prof. Law. 1 (2005). The Rules were the product of the Kutak Commission, as it became known, formed in 1977 to assemble a set of governing rules for the profession. Freedman, *Kutak Model Rules*, at 1166. Some of the Model Rules, including Rule 1.9, explicitly rejected the old canons. Maher, *Keeping Up Appearances* (2002 revisions to Rule 1.9 deleted the lingering reference to "appearance of impropriety" originally housed in Canon 9 because it was "no longer helpful to the analysis of questions arising under this Rule"). The Kutak Commission's proposed Model Rules of Professional Conduct were issued in 1983 and then adopted by the states in the years that followed. Indiana adopted the Model Rules of Professional Conduct as its Rules of Professional Conduct in 1987. *Goot*, 894 F.2d at 234.

## B. *Rule 1.9 Does Not Disqualify Cento from Representing Watkins*

The district court looked to the language of Rule 1.9 and its commentary and determined that the dispute between Watkins and Trans Union neither involved the "same transaction or legal dispute" as those prior cases in which Cento represented Trans Union nor involved a "sub-

stantial risk" of confidential information Cento may have gained while working for Trans Union materially advancing Watkins' claim. *Watkins*, 2016 WL 4919999, at *4, *6. We agree.

### 1. *Different Transactions*

 First, the present and prior matters are not part of the same legal dispute. The question turns "on the facts of a particular situation or transaction," not whether the matters merely involve the same type of legal issues. Ind. R. Prof'l Conduct 1.9, cmt. 2. Here, Cento's prior representations of Trans Union and his present representation of Watkins both involve FCRA violations but do not turn on the same facts of one "particular situation or transaction." *Id.* The facts upon which Watkins' case will turn—recurrent false collection listings on his credit report, despite multiple requests to remove them— are unique to his claim against Trans Union and are not interwoven with any individual case in which Cento represented Trans Union in the past.

A comparison between Cento's representation of Watkins and the representation at issue in an Indiana Court of Appeal opinion reinforces this conclusion. In *XYZ, D.O. v. Sykes*, attorney Kathleen Clark represented a doctor in six malpractice cases. 20 N.E.3d 582, 583–84 (Ind. App. 2014). Five years after her representation of the doctor concluded, she began working for another law firm. *Id.* at 584. At that firm, Clark conducted an intake interview for a plaintiff asserting a malpractice claim against the same doctor she previously represented. The firm took the case and directed Clark to work on it. *Id.* The trial court denied a motion to disqualify the entire firm for which Clark now worked, but the appellate court reversed. *Id.*

Although there are superficial similarities between the two cases, on closer ex-amination, the facts presented in *XYZ* are distinct from those in the present case, which point to a different outcome. The problem was that the plaintiff in *XYZ* was suing both the doctor and the hospital where he performed surgery on the plaintiff. The plaintiff's claim against the hospital was that it had been negligent in issuing credentials to the doctor *based on the same surgeries in which attorney Clark had defended him.* Looking to the language of Comment 3 to Rule 1.9, *XYZ* found that the old and new representations were substantially related because the new complaint was "based in part upon the Hospital's alleged failure to adequately investigate the circumstances surrounding those six prior malpractice cases in which Clark represented [the d]octor." *Id.* at 587. Accordingly, the appellate court found the new and old representations were substantially related, and that the passage of time did not cure the problem: "If the six prior medical malpractice cases remain relevant regarding the current allegation of negligent credentialing, as [the law firm] admits, any confidential factual information gleaned during those prior representations can hardly be deemed stale or obsolete." *Id.* at 587–88.

 *XYZ* is easy to understand on those terms, but this case is quite different. Watkins' claims do not turn on any specific facts of any prior matter in which Cento represented Trans Union. Watkins' complaint does not refer to any specific prior litigation against Trans Union in which Cento represented the company. In contrast, in *XYZ*, the prior malpractice cases were specifically at issue in the complaint in the present litigation against the doctor. Thus, while the old and new representations in *XYZ* involved the "same transaction or legal dispute," the same cannot be said of the old and new representations at issue in this case. The district

court did not err in finding the disputes here to be factually distinct.[2]

## 2. *No Substantial Risk of Using Confidential Information*

■ On Trans Union's other route to show that disqualification is needed, it must show a "substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Ind. R. Prof'l Conduct 1.9, cmt. 3. We look first to the nature of the information Cento gained as an attorney for Trans Union.

Some of the information Cento learned while working for Trans Union might be categorized as general knowledge and experience. It is undisputed that Cento gained experience while working for Trans Union. In the words of the district court, that experience "will indisputably benefit his current and future clients." *Watkins*, 2016 WL 4919999, at *6. Cento even advertises his extensive experience with FCRA litigation for both plaintiffs and defendants on his website, which is bound to raise eyebrows. However, having experience is not the same as possessing confidential information.

It is also undisputed that general knowledge about Trans Union policies and practices to ensure that credit reports are accurate is discoverable if it is relevant to Watkins's alleged FCRA violation. To determine the merits of Watkins' claims, the court or jury will need to make findings of fact about whether the procedures Trans Union used to prepare and to check the accuracy of Watkins' consumer report were reasonable. See 15 U.S.C. § 1681e(b). As in other cases in which Trans Union

has been a defendant, its policies and procedures that allegedly resulted in the mixed file and that were used to remedy the problem will be subject to scrutiny. See, e.g., *Price v. Trans Union, LLC*, 839 F.Supp.2d 785, 790–91 (E.D. Penn. 2012) (explaining how defendant credit reporting agency's procedures result in mixed files); *O'Connor v. Trans Union Corp.*, No. Civ. A. 97-4633, 1998 WL 770626, at *3 (E.D. Penn. Nov. 5, 1998) (compelling response to interrogatory regarding procedures used in handling plaintiff's mixed file). Comment 3 makes clear that information "disclosed to the public or to other parties adverse to the former client ordinary will not be disqualifying." Ind. R. Prof'l Conduct 1.9, cmt. 3.

Further, in cases involving an organizational client like Trans Union, "general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation." Ind. R. Prof'l Conduct 1.9, cmt. 3. Thus, the general knowledge and experience Cento gained while defending Trans Union is not the type of confidential information with which Rule 1.9 is concerned. The commentary makes clear that Cento's repeated representations of Trans Union in FCRA violation cases do not preclude him from representing a new client in a factually distinct suit even if his new representation is adverse to his former client. *Id.*, cmt. 2.

Nevertheless, while some information Cento gained was of the experience-building sort, the district court found that Cento also "undoubtedly did learn some truly confidential information" while working for Trans Union. *Watkins*, 2016 WL 4919999, at *5. The commentary teaches that courts and lawyers should consider the possibility

---

**2.** We have observed that district courts may construe their own local rules. Even when a federal court has incorporated a state's rules by reference, nothing compels the federal court to adopt the state court's interpretation of the rule. *Weibrecht v. Southern Ill. Transfer, Inc.*, 241 F.3d 875, 882 (7th Cir. 2001).

that confidential information "acquired in a prior representation may have been rendered obsolete by the passage of time," and that prospect may be "relevant in determining whether two representations are substantially related." Ind. R. Prof'l Conduct 1.9, cmt 3.

The district court found here that the passage of time had removed any substantial risk that any confidential information from years ago might advance Watkins's litigation. We do not find a clear error or an abuse of discretion. Not only, as the district court noted, have some 500 opinions been issued since Cento ceased representing Trans Union on "just one of several provisions of the FCRA [15 U.S.C. § 1681e] that Watkins alleges Trans Union violated," but also, as Cento points out, competitive advantage in credit reporting is created through technological advances, of which there have been many over the last twelve years. *Watkins*, 2016 WL 4919999, at *5 n.2. In light of the technological advancements and the sheer number of FCRA claims litigated between the old and new representations, the district court observed that it is not "reasonable to believe that the manner in which [Trans Union] ha[s] handled [litigation] has remained static." *Id.* at *5. Over ten years have passed since Cento last represented Trans Union. It was not clear error for the district court to find that any confidential information he may have gained during his prior representation has been rendered obsolete.

Again, a comparison to the Indiana Court of Appeals decision in *XYZ* is instructive. There, the court rejected the argument that the passage of time—almost seven years—would render obsolete the confidential factual information gained by the attorney. It reached that conclusion because the six prior malpractice cases remained relevant in the present litigation.

*XYZ*, 20 N.E.3d at 587–88. The attorney in *XYZ* had learned factual information regarding specific malpractice claims that were at issue in the new lawsuit. In this case, by contrast, attorney Cento learned no factual information regarding the specific FCRA violation at issue in Watkins' case during his prior representations of Trans Union. Also, the *XYZ* doctor was not an "organizational client," which Trans Union was to Cento. See Ind. R. Prof'l Conduct 1.9, cmt 3.

Because of the passage of time and the lack of any factual overlap between the Watkins's complaint and any prior matter in which Cento defended Trans Union, the district court did not abuse its discretion in applying Rule 1.9 to hold that the Cento's prior and present representations do not involve the same or substantially related matters.

### C. *No Mistake of Law*

In an attempt to avoid this application of Rule 1.9, Trans Union argues that the district court abused its discretion by applying the wrong law. Trans Union relies on two disqualification cases involving former clients, both decided in a different state in 1983 before the adoption of the Model Rules in Indiana. *LaSalle National Bank*, 703 F.2d 252; *Analytica*, 708 F.2d 1263. This argument has worked for Trans Union in the past. In fact, Cento has already twice lost to Trans Union on disqualification motions decided under the reasoning of *LaSalle National Bank* and *Analytica*. See *Childress I*, 2012 WL 6728339; *Hobson*, 2013 WL 2443917.

In *LaSalle National Bank*, we applied a "substantial relationship" test that "embod[ied] the substance of Canon 4 of the A.B.A. Code of Professional Responsibility, which protect[ed] the confidences of a client against disclosure and possible use against him, and of Canon 9, which pro-

vide[d] that an attorney must avoid even the appearance of impropriety." 703 F.2d at 255; see also *Goot*, 894 F.2d at 234 (Canon 4 stated a "lawyer should preserve the confidences and secrets of a client," and Canon 9 stated a "lawyer should avoid even the appearance of professional impropriety."). The substantial relationship test for disqualification in place prior to the adoption of Rule 1.9 was broad. It was satisfied if "it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation." *LaSalle National Bank*, 703 F.2d at 255, citing *Cannon v. U.S. Acoustics Corp.*, 398 F.Supp. 209, 223 (N.D. Ill. 1975), aff'd in part and rev'd in part, 532 F.2d 1118 (7th Cir. 1976). Whether the party seeking disqualification could prove that the attorney actually received confidential information during his employment was irrelevant. *LaSalle National Bank*, 703 F.2d at 255, citing *Schloetter*, 546 F.2d at 710; see also *Analytica*, 708 F.2d at 1266 ("It is irrelevant whether [the lawyer] actually obtained such [confidential] information.").[3]

In the *Childress* litigation, the magistrate and district judges applied to Cento the substantial relationship test outlined in *LaSalle National Bank* and *Analytica*. *Childress I*, 2012 WL 6728339, at *3; *Childress v. Trans Union, LLC* (*Childress II*), No. 1:12-CV-00184-TWP-DML, 2013 WL 1828050, at *3 (S.D. Ind. Apr. 30, 2013). The district judge found that Cento acted as a practical extension of Trans Union's in-house counsel and that his extended representation of Trans Union in hundreds of cases established a substantial relationship between his prior representation of Trans Union and his representation of Childress in the pending litigation. *Childress II*, 2013 WL 1828050, at *4–5. The district court in *Hobson* undertook a similar analysis in denying Cento's request for discovery and motion to stay the disqualification proceedings. *Hobson*, 2013 WL 2443917.

The *Childress* and *Hobson* opinions did not address the commentary to Rule 1.9. Instead, the *Hobson* court emphasized that the Seventh Circuit's substantial relationship test embodied Canons 4 and 9 of the A.B.A. Code of Professional Responsibility. *Id.* at *2, citing *Westinghouse*, 588 F.2d at 224. The *Childress* district court emphasized in its order denying Cento's motion to reconsider that *LaSalle National Bank* and *Analytica* decisions "remain good law to the extent they set forth the well-regarded Seventh Circuit approach to the substantial relationship standard." *Childress v. Trans Union, LLC* (*Childress III*), No. 1:12-CV-00184-TWP-DML, 2013 WL 3071273, at *2 (S.D. Ind. June 18, 2013).

The problem is that the substantial relationship test applied in *Childress* and *Hobson* embodied Canons 4 and 9 of the A.B.A. Code. The Code and those canons no longer governed Indiana attorneys at the time of the *Childress* and *Hobson* decisions and no longer govern them now. Trans Union argues that the district court

---

3. We used a three-part test to determine whether a substantial relationship was present. "First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client." *LaSalle National Bank*, 703 F.2d at 255–56, citing *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir. 1978). The satisfaction of the test triggered a rebuttable presumption that the attorney received confidential information during the prior representation. *Id.* at 256.

here "applied the wrong standard . . . based on Indiana Rule 1.9" and "improperly relied on language in the Comments . . . to fashion a new . . . test for attorney disqualification." We disagree. The district court correctly looked to Rule 1.9 and its commentary adopted after *LaSalle National Bank* "to clarify the contours" of the substantial relationship test. See *Shelton v. Trans Union, LLC*, No. 1:16-cv-01278-SEB-MJD, slip op. at 4 (S.D. Ind. Dec. 19, 2016).[4]

Trans Union's reliance on *LaSalle National Bank* and other federal precedents predating Indiana's adoption of Rule 1.9 is not persuasive. Both state and federal district courts look to Rule 1.9's commentary for guidance in deciding disqualification issues based involving former clients. The commentary to Rule 1.9 states plainly that to require disqualification of an attorney from a new representation against a former client, either the old and new matters must be the same factual dispute or there must be a substantial risk of confidential information being used to materially advance the new client's interests. Cento's old and new representations do not amount to "a changing of sides" in a specific legal dispute. See Ind. R. Prof'l Conduct, cmt. 2. There is no specific factual overlap between Cento's prior representations of Trans Union and his representation of Watkins. The general knowledge Cento gained while working at Trans Union is not the type of confidential information that poses a substantial risk of materially advancing Watkins' claims. Moreover, more than a decade has passed since Cen-

to was privy to Trans Union's internal policies and practices or legal strategy—confidential or otherwise.

Accordingly, the decision of the district court is AFFIRMED.

SYKES, Circuit Judge, concurring in part and dissenting in part.

I agree with my colleagues that this disqualification dispute is governed by Rule 1.9 of the Indiana Rules of Professional Conduct, not the old common-law standard derived from Canons 4 and 9 of the ABA's Model Code of Professional Responsibility and elaborated in *LaSalle National Bank v. Lake County*, 703 F.2d 252 (7th Cir. 1983), and *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir. 1983). I therefore join Parts I, IIA, and IIC of the majority opinion. In these sections my colleagues explain the background of this case and the evolution of the legal standard. I agree and have nothing to add about the current state of Indiana and circuit law.

I part company with my colleagues over the consequences of Rule 1.9 for this case. The rule, as expounded in the commentary, prohibits John Cento from suing his former client Trans Union, LLC, the national credit-reporting agency, for alleged violations of the Fair Credit Reporting Act ("FCRA" or "the Act"). Accordingly, I do not join Part IIB or the mandate to affirm. I would reverse and remand with instructions to disqualify Cento.

---

4. In *Shelton*, another recent case in which Cento represented a client against Trans Union, Judge Barker rejected Trans Union's argument that Judge Lawrence's reliance on the commentary to Rule 1.9 in his *Watkins* opinion created a new substantial relationship test. *Shelton*, No. 1:16-cv-01278-SEB-MJD, slip op. at 3. Rather than create a new sub-

stantial relationship test, Judge Barker observed, Rule 1.9 was adopted after *LaSalle National Bank* to clarify the contours of the test and provided guidance for its application. *Id.* at 4. Judge Barker agreed with Judge Lawrence that Cento should not be disqualified from representing clients in new cases against Trans Union. *Id.* at 5.

## I.

For almost five years (from 2001 through July 2005), Cento served as Trans Union's outside litigation counsel, first with Katz & Korin, P.C., and later with Schuckit & Associates, P.C. In that capacity Cento defended the company in hundreds of FCRA suits. For at least two and a half of those five years, Cento worked *nearly exclusively* on FCRA cases brought against Trans Union. In total, Cento billed Trans Union for approximately 4,200 hours of work on some 250 cases filed by consumers against the agency alleging violations of the Act.

Most of this litigation involved claims alleging violations of 15 U.S.C. §§ 1681e(b) and 1681i. Briefly, § 1681e(b) requires credit-reporting agencies to follow "reasonable procedures" to assure the accuracy of the information they report, and § 1681i(a)(1)(A) requires the agencies to conduct a "reasonable reinvestigation" if a consumer disputes the completeness or accuracy of the information in his file. Having spent years and thousands of billed hours defending the reasonableness of Trans Union's credit-reporting procedures and reinvestigations, Cento now sues his former client alleging violations of these same statutory provisions.

Cento's role as Trans Union's outside FCRA counsel was not limited to serving as the agency's litigation counsel. Cento also supervised other lawyers working on Trans Union cases, advised Trans Union on general litigation strategy in FCRA matters, and counseled his client on how to avoid FCRA risk. I'll have more to say about the scope of Cento's representation later. For now it's enough to note that it was lengthy, extensive, and undeniably relevant to the claims in the present suit.

Cento last represented Trans Union in July 2005 when he left Schuckit & Associates for another firm. Later, in 2013, he formed Cento Law, a boutique specialty firm that represents consumers in FCRA suits against credit-reporting agencies. The firm's website touts the qualifications of its attorneys to litigate FCRA claims against the major credit-reporting agencies—including, as my colleagues have noted, their "years of prior representation of two of the three national consumer reporting agencies, Trans Union and Equifax." Majority Op. at p. 517. My colleagues go only so far as to say that this advertisement "is bound to raise eyebrows." *Id.* at p. 522. I go further. Cento is hustling litigation business against Trans Union by implying that he has useful inside information about his former client's operations that would advance a prospective client's cause.

Even before he set up his own practice specializing in consumer suits against credit-reporting agencies, Cento had changed sides in FCRA litigation and begun to litigate these claims against his former client. In January 2012 he filed a proposed FCRA class action against Trans Union and immediately faced a disqualification motion. He lost; the district court removed him from the case. *Childress v. Trans Union, LLC*, No. 1:12-cv-00184-TWP-DML, 2012 WL 6728339 (S.D. Ind. Dec. 28, 2012) (magistrate judge's decision disqualifying Cento); *id.*, 2013 WL 1828050 (S.D. Ind. Apr. 30, 2013) (district judge's decision overruling Cento's objections to disqualification). In 2013 he was again disqualified in another FCRA suit against Trans Union. *Hobson v. Trans Union, LLC*, No. 1:13-cv-00054-JD-RBC (N.D. Ind. Nov. 21, 2013), ECF No. 63 (magistrate judge's decision disqualifying Cento; the suit was then dismissed by the parties with prejudice).

The present FCRA suit on behalf of plaintiff Richard Watkins is not materially different, but this time Cento persuaded a

district judge to let him proceed against his former client. My colleagues affirm that decision. With respect, I disagree. They and the district judge have overlooked key parts of the commentary to Rule 1.9 and in doing so have misapplied the rule. The result does regrettable damage to the professional norms that hold lawyers to a continuing duty to maintain the confidences acquired from former clients and to refrain from subsequent professional engagements that exploit those confidences against the former client.

## II.

Rule 1.9, entitled "Duties to Former Clients," provides in relevant part:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

IND. R. OF CT., R. OF PROF'L CONDUCT 1.9(a) (2016). The commentary to the rule makes clear that after a client-lawyer relationship ends, "[the] lawyer has certain continuing duties [to the former client] with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule." *Id.* cmt. 1.

Like most problems in professional ethics, sorting out where the lawyer's duties lie under this rule is a highly contextual inquiry. The commentary contains instructions, illustrations, and guideposts to help lawyers and judges properly apply the rule. To begin, the commentary explains that "[t]he scope of a 'matter' for purposes of this [r]ule depends on the facts of a particular situation or transaction" and "[t]he lawyer's involvement in a matter can also be a question of degree." *Id.* cmt. 2.

That does not tell us much, but it does convey the idea that a "matter" for purposes of the rule is not a narrow or static concept. As applied to litigators, a "matter" may be a single case or it may extend more broadly, depending on the circumstances.

As my colleagues have noted, Comment 2 goes on to say that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." *Id.* At first blush this seems to give Cento the green light to represent any FCRA claimant in a suit against Trans Union as long as the case is factually distinct from those he previously handled on behalf of his former client.

But there is a qualifier. In all cases "[t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." *Id.* There's no question that Cento has changed sides in FCRA matters. It's not controversial for a litigator to shift from one side to the other in a particular area of litigation. Cento is certainly free to use the expertise he gained as Trans Union's FCRA counsel to represent consumers in cases against other credit-reporting agencies. But Cento has changed sides in FCRA litigation involving his former client—from defending Trans Union in § 1681e(b) and § 1681i litigation to prosecuting these claims on behalf of consumers in suits against his former client. Yes, this case is factually distinct from the others; literally speaking, it is not the "same matter" as any of the other cases. That does not, by itself, end the ethical inquiry.

The disqualification question turns on whether the present case is "substantially related" to the 250 or so FCRA cases Cento handled for Trans Union.[1] Comment 3 covers this subject, explaining that

> [m]atters are "substantially related" for purposes of this [r]ule if they involve the same transaction or legal dispute *or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.*

*Id.* cmt. 3 (emphasis added).

This suit does not involve the "same transaction or legal dispute" as the prior litigation, though it *does* involve the identical *type* of legal action. As I've already noted, however, Comment 2 tells us that a lawyer who recurrently handled matters of a certain type for a client is not *automatically* foreclosed from handling a factually different matter of the same type against the client after the relationship ends. Still, Cento *must* be disqualified from this suit if the nature and scope of his prior work for Trans Union creates a substantial risk that Trans Union's confidential information—that is, the confidential client information that Cento would have acquired in the ordinary course of a representation of that type—would materially advance Watkins's position.

The commentary provides several examples to illustrate how this general principle applies in actual practice:

> For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a

divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for non-payment of rent.

*Id.*

These examples clarify that a lawyer who acquires confidential client information of a particular type (e.g., a client's financial information or information about a client's environmental compliance) owes a continuing duty to the client after the relationship ends: He must keep that information confidential and may not represent a new client if there is a substantial risk that the information would materially advance the new client's position in the subsequent matter. When a substantial risk of information exploitation exists, the duties owed to the old and new client are in conflict, and the new representation is prohibited *even if* the subsequent matter is factually distinct.

As Trans Union's litigation counsel in hundreds of FCRA cases spanning almost five years, Cento necessarily acquired comprehensive confidential information about his client's credit-reporting and re-investigation operations, as well as its litigation and settlement strategies, risk-avoidance protocols, and overall FCRA compliance. The present suit—like most of the suits Cento defended for Trans Union—alleges that the company failed to follow reasonable credit-reporting and re-investigation procedures in violation of

---

1. Watkins's position is obviously materially adverse to Trans Union's, so that element of

Rule 1.9 is met.

§§ 1681e(b) and 1681i. Having acquired extensive private information about Trans Union's past compliance with §§ 1681e(b) and 1681i, Cento cannot now represent Watkins in this suit against Trans Union for violating those same statutes. In the ordinary course of the prior representation, Trans Union would have given him unfettered access to all internal information necessary to defend it against liability under §§ 1681e(b) and 1681i—information that is undoubtedly relevant to and would advance Watkins's position in the present suit. The risk of exploitation of the former client's confidences is both real and substantial. Rule 1.9 requires his disqualification.

The district judge's contrary conclusion rests largely on this passage in Comment 3:

> Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation....

*Id.* My colleagues also rely heavily on this passage. *See* Majority Op. at pp. 521–23. Fair enough, but their analysis omits what comes next in the commentary:

> [O]n the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to

establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. *A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.*

*Id.* (emphases added).

This part of the commentary adds two important points. First, the test for disqualification focuses on the nature of the prior representation and the specific factual information that a lawyer *could be expected to acquire* from his client in the ordinary course of providing legal services of that type. In other words, the test is an objective one. The former client is not required to divulge the specific information it disclosed to the lawyer in order to establish a substantial risk that the information would advance the new client's position in the subsequent matter.[2] The inquiry instead looks to the *nature* of the services the lawyer provided and the kind of information a lawyer normally would learn in the ordinary course of a representation of that type.

Second, disqualification is required if the confidential client information the lawyer normally would have acquired in the prior representation is relevant to the subsequent representation. If the information is relevant to the new matter, then a substantial risk of exploitation exists. The lawyer's continuing duty to keep the former client's confidences conflicts with his duty to zealously represent the interests of the new client. The two examples given in the commentary confirm this understanding of the rule. *See supra* pp. 26–27.

---

**2.** Because a former client need not reveal the specific confidential information it gave to the lawyer, the discovery order in this case was questionable.

Putting all these elements together, Cento is disqualified from this case. For an extended period of time he served as Trans Union's FCRA litigation counsel and in that capacity was deeply involved in defending the agency in hundreds of suits alleging violations of §§ 1681e(b) and 1681i. Legal services of this nature necessarily require broad access to confidential factual information about the client's data-collection and credit-reporting operations, its protocols for ensuring the accuracy of information in credit reports, information relating to the reasonableness of its reinvestigations, and the client's litigation and dispute-resolution strategies. An engagement of this nature and scope also necessarily entails extensive confidential communication with the client's managerial and other staff—as well as in-house counsel—regarding operational and transactional facts and FCRA compliance and risk-avoidance more generally.

My colleagues maintain that much of this information was discoverable and would have been disclosed in the prior litigation. Majority Op. at p. 522. They also find no error in the district judge's conclusion that any remaining confidential information has become obsolete in the 12 years since Cento last represented Trans Union. *Id.* at pp. 522–23. I do not doubt that some of this information would have been turned over in discovery in the prior litigation, and a subset of that discovery material may have found its way into the public court record. But not all. The parties agree that protective orders were used in some cases. And some of the confidential information Cento can be presumed to have acquired would not have been subject to discovery at all—at a minimum, the factual and strategic information gleaned from privileged communications with Trans Union personnel, risk analyses, and settlement strategies.

The district judge also concluded that any confidential client information that Cento acquired from Trans Union is surely obsolete due to the passage of time, owing to unspecified "technological advances" and the "sheer number of FCRA claims litigated between the old and new representations." *Id.* My colleagues find no abuse of discretion, but I'm not so sanguine. Many of the key Trans Union personnel remain with the company, and Cento worked with them in the prior representation to develop factual records, prepare and defend depositions, devise litigation strategies, and analyze settlement options. The information exchanged in these communications is clearly confidential. We have no nonspeculative basis to declare it irrelevant or obsolete.

Quite the contrary. Now that he's been given the go-ahead to represent Watkins in this suit, Cento may depose some of the same Trans Union personnel he previously prepared and defended in depositions. That he has inside information about their past testimony is a strategic advantage and far from obsolete. He may cross-examine them in court or sit across from them at the negotiating table. Having been privy to their thinking about the strengths and weaknesses of prior FCRA cases against Trans Union, he can now use that information for Watkins's benefit, either in court or in settlement negotiations. It's simply unreasonable to conclude that in nearly five years as Trans Union's FCRA litigation counsel—personally handling hundreds of cases—Cento acquired *no* confidential Trans Union information that has *any* continuing relevance to this FCRA suit against his former client.

Finally, I disagree with my colleagues that comparing this case to *XYZ, D.O. v. Sykes*, 20 N.E.3d 582 (Ind. Ct. App. 2014), supports the district judge's no-disqualification ruling. *XYZ* was a case of imputed

disqualification. From 2003 to 2005, Kathleen Clark represented a doctor in six malpractice suits, initially as a sole practitioner and later with a firm. *Id.* at 583–84. Her representation of the doctor ceased in April 2005 when she left for another firm, and in February 2010 she again changed firms. *Id.* In mid-2012 Clark did some initial intake work for her firm in a new malpractice case against the doctor. Although she turned her work over to a colleague and he assumed responsibility for the case, the doctor and hospital moved to disqualify the entire firm. *Id.* The trial judge denied the motion, but on interlocutory appeal the Indiana Court of Appeals reversed.

Applying Rule 1.9, the appellate court first noted that the case involved a malpractice claim against the doctor and a claim against the hospital for negligent credentialing "based in part upon the [h]ospital's alleged failure to adequately investigate the circumstances surrounding those six prior malpractice cases in which Clark represented the [d]octor." *Id.* at 587. Although the cases did not literally involve the "same transaction," they were nonetheless "substantially related for the purposes of Rule 1.9." *Id.* The new representation involved "one claim of the same subject matter as Clark's prior representation[ ] of [the] [d]octor, and another claim that grew out of and is directly related to Clark's prior representation[ ] of [the] [d]octor." *Id.* In these circumstances, the court held, "there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation[ ] would materially advance the [p]laintiff's position in the present case." *Id.*

The firm argued that the passage of time—about seven years—rendered the confidential information obsolete. The court quickly dispatched that argument:

"If the six prior medical malpractice cases remain relevant regarding the current allegation of negligent credentialing, as [the firm] admits, any confidential factual information gleaned during those prior representations can hardly be deemed stale or obsolete." *Id.* at 587–88. Finally, the court held that because Clark had been the doctor's primary counsel in the prior cases, the presumption that she shared his confidences within her new firm was irrebuttable; the entire firm was disqualified. *Id.* at 588–89.

My colleagues are quite right that in *XYZ* the attorney's prior representation of the doctor was *directly* relevant to the negligent-credentialing claim against the hospital. Majority Op. at p. 521. That made the conflict of interest fairly obvious, but it doesn't make the decision inapplicable here. The important lesson of *XYZ* for this case is the court's "substantial risk" analysis, which was not limited to the negligent-credentialing claim.

Because the nature and scope of Cento's prior work as Trans Union's FCRA counsel was so extensive, there is a substantial risk—even after 12 years—that the confidential client information he learned in the prior representation would materially advance Watkins's position in this litigation. We should reverse with instructions to grant the disqualification motion. I respectfully dissent.