In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 20-2048, 20-2049, 20-2080, 20-2086, 20-2087, 20-2088, 20-2100, 20-2115, 20-2116, 20-2117, 20-2133, 20-2208, 20-2229

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENTREVION WATKINS, *et al.*

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Central District of Illinois.
No. 1:18-cr-10036 — **James E. Shadid**, *Judge.*

———————————

ARGUED NOVEMBER 9, 2022 — DECIDED JULY 8, 2024

———————————

Before ROVNER, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* The Bomb Squad was a street gang that used violence against anyone who threatened its reputation, turf, or drug sales. Fourteen gang members were charged with violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), along with other crimes. One member, Jovan McCree, pleaded guilty. The remaining defendants

went to trial and were convicted by a jury; they are Kenwan Crowe, Lloyd Dotson, Mytrez Flora, Keith Gregory, Eugene Haywood, Ezra Johnson, Andre Neal-Ford, Raevaughn Rogers, Lance Washington, Kentrevion Watkins, Torieuanno White, Sherman Williams, and Jahlin Wilson.

These defendants now seek to vacate their convictions on numerous grounds. Their principal argument is that the district judge ran afoul of *Batson v. Kentucky*, 476 U.S. 79 (1986), when selecting the jury. For the reasons provided, we retain jurisdiction of the appeal and order a limited remand to permit the district court to make supplemental findings as to this issue. As for the remaining arguments defendants raise on appeal, we find no reversible error and affirm.

## I. Background

### A. Factual Background

The Bomb Squad street gang terrorized the Peoria area from 2013 to 2018. Its members committed and attempted to commit numerous murders, trafficked in illegal drugs, and engaged in multiple robberies. Within the loose hierarchy of the Bomb Squad, its leaders had the authority to order lower-ranking members to rob, shoot, or murder rival gang members. A lower-ranking member's ruthlessness earned greater respect and standing within the organization. Although Bomb Squad members often identified themselves within smaller subgroups, such as 2300, Magnolia, Harrison Homes, Family First, Marco Movement, or Geek Team Squad, they demonstrated their affiliation and allegiance to the larger organization through hand signals, clothing, tattoos, slogans, and rap lyrics. What follows is a sample of the Bomb Squad's criminal activities the government presented at trial.

To protect their reputation and territory, Bomb Squad members often turned to gun violence. For example, after being chased and disrespected by rival gang members in June 2013, Haywood obtained a gun from fellow Bomb Squad member Zarmere Barnes. Within hours, Haywood and another member, Johnson, rode bikes to where Haywood had been chased. Haywood then shot at the men who had chased him killing one of them, Eric Brown. On another occasion, just one month later, Bomb Squad leader Raheem Wilson warned his colleagues to be on the lookout for Antonio Scott, a rival gangster whom Wilson had robbed. A few days later, Haywood, along with fellow gang members, Dotson and Flora, shot at Scott's car, fatally injuring a passenger, Tyrann Chester.

Bomb Squad members retaliated aggressively against even trivial slights. For instance, after White's sisters were kicked out of a party in August 2015, White shot at rival gang member, Sam Powell, in an alley outside of the party.

The Bomb Squad also zealously protected its territory, shooting at rival gang members on multiple occasions. In February 2015, for example, Haywood shot at a suspected rival gang member. Haywood then passed the gun to another Bomb Squad member before the police arrived. Haywood pleaded guilty in Illinois state court to unlawful use of a weapon by a felon. About a year later, White and another Bomb Squad member shot at two suspected rival gang members in a car parked in Bomb Squad territory, hitting the driver multiple times.

On one evening in the spring of 2016, members of Zone 4, a rival gang, began shooting at people and buildings in Bomb Squad territory. Later that night, McCree, who was a Bomb

Squad leader, ordered fellow members, Wilson and Crowe, to encroach into Zone 4's territory and shoot Zone 4 members "CB" and "Freebands" in retaliation.

In May 2016, Neal-Ford shot at a car that he believed was occupied by rival gang members. This occurred near Arago Street and Humboldt Street in Bomb Squad territory. That same month, Wilson robbed an individual, Isaiah Richardson, and shot him during a dice game in Bomb Squad territory.

In May 2017, White and Flora shot at suspected rival gang members as they drove a truck past the Harrison Homes apartment complex in Bomb Squad territory. That same month, Gregory, Johnson, and White agreed to shoot a suspected rival gang member who had just completed maintenance work at a market in Bomb Squad territory. As the man sat in the passenger seat of his co-worker's car, Gregory shot him multiple times.

In August 2017, Courtney Jones was walking to his aunt's house in Bomb Squad territory and happened to get into an argument with a group of men. As Jones approached his aunt's front doorstep, a Black man with dreadlocks, later identified as Haywood, rode up on his bicycle, asked Jones whether his name was Courtney and said, "I heard you had some words with my people." Haywood then shot Jones twice.

The gun violence the Bomb Squad perpetrated was not confined to its own territory. Washington shot Martell Perkins in the leg as he left a nightclub in July 2016. Perkins was affiliated with Moe Block, a rival gang.

That same year, Bomb Squad members made several attempts to murder another rival gang member, Demoney

Coleman, in surrounding areas. Rogers shot at Coleman in August 2016. Crowe and Neal-Ford fired numerous shots into Coleman's house when he was hosting relatives on Thanksgiving Day. And Rogers and Crowe separately shot at Coleman on different occasions in March 2017.

After a Bomb Squad leader, Raheem Wilson (nicknamed "Boosie"), was murdered in February 2017, Dotson retaliated against an individual named Ryan Greenwood, because Dotson believed Greenwood was to blame. Dotson fired eighteen shots at Greenwood's car as Greenwood was picking up a passenger in rival gang territory in May 2017. One bullet struck the passenger in the back. Dotson was later found with a gun that matched the one that was used during that shooting.

While at a Bradley University party in April 2018, Watkins identified Anthony Polnitz as a rival gang member and handed a gun to fellow Bomb Squad member Jermontay Brock. Brock then shot Polnitz once in the face and twice in the back, killing him. One of the bullets went through Polnitz and killed Nasjay Murray, a Bradley student.

In addition to committing gun crimes, members of the Bomb Squad operated numerous trap houses, where they stored firearms and distributed crack, heroin, and marijuana. During its investigation into the group, government agents coordinated a number of controlled buys from Bomb Squad members, including Dotson, Johnson, and Williams. For instance, in March 2018, Dotson supplied a Bomb Squad member with approximately 3.5 grams of crack to sell to an undercover federal agent. A subsequent search of Dotson's apartment revealed two digital scales and ten baggies of crack. On another occasion, Johnson gave fellow gang member Jordan

Timothy one gram of heroin to sell to an undercover agent. And Williams sold fifty-eight grams of marijuana to an undercover agent through Bomb Squad member Juan Faulkner for $500. Williams advertised his marijuana sales on Facebook.

Bomb Squad members also robbed people of their money and property. For example, in 2016, White, Gregory, and others accosted two individuals at gunpoint and stole a cell phone, alcohol, and marijuana. Williams, Crowe, and others also burglarized a house in August 2017 and stole a safe containing twelve firearms that they distributed to other Bomb Squad members.

### B.  Procedural History

After a seven-week trial that included over eighty witnesses, the jury convicted all thirteen defendants of engaging in a RICO conspiracy in violation of 18 U.S.C. § 1962(d). Dotson, Gregory, Haywood, Johnson, Washington, White, and Wilson were also convicted of assault with a dangerous weapon and attempted murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(3) and (5), as well as brandishing and discharging a firearm while committing a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (iii). Additionally, the jury found White and Wilson guilty of possessing firearms while felons in violation of 18 U.S.C. § 922(g)(1) and Dotson, Johnson, and Williams guilty of possessing with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). In the end, the district court sentenced Haywood to life imprisonment, and the other defendants received lengthy prison terms.

We first will address the common issues defendants raise, before turning to their individual arguments.

## II. Discussion

### A. Jointly Raised Issues

#### 1. *Batson*

We begin with the defendants' contention that the government improperly selected jurors based on race. In *Batson*, 476 U.S. 79, the Supreme Court reaffirmed the principle that the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from using a peremptory challenge to strike a prospective juror because of the individual's race. In so doing, the Court adopted a three-step process for trial courts to follow to determine whether an Equal Protection violation has occurred. *Id.* at 93–98.

First, a defendant must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. To establish a *prima facie* case, a defendant must indicate that "he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at 96 (citation omitted); *see Hernandez v. New York*, 500 U.S. 352, 355 (1991) (acknowledging Latinos as a cognizable ethnic group under *Batson*). Furthermore, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96.

Second, once a defendant establishes a *prima facie* case of discrimination, the burden of production shifts to the

government, and the prosecutor must articulate race-neutral reasons for the peremptory challenge in question. *Id.* at 94.

Third, the trial court must consider the totality of the circumstances and determine whether the government's explanation is credible. *Id.* at 98 n.21.

Typically, "we review the district court's *Batson* findings for clear error." *United States v. McMath*, 559 F.3d 657, 663 (7th Cir. 2009). But when a defendant challenges the manner in which the district court conducted the *Batson* inquiry, our review is *de novo. See id.* Here, the defendants assert that the district court applied the wrong legal standard at step one and failed to make the necessary credibility determination at step three.

All thirteen defendants are Black males, and the district court called five panels of potential jurors.[1] The first panel included Juror 26, a Black man who recently had been employed by Peoria's public housing authority; Juror 58, a woman with a dark complexion who taught Spanish and English as a Second Language (ESL) at a private school; and Juror 154, a white female who was a retired public elementary school teacher.[2] Following *voir dire* of the first panel, the district court allowed counsel to exercise their peremptory challenges, and the government struck all three individuals without explanation.

---

[1] Defendants assert that the jury consisted of all white jurors, but we are unable to find any indication in the record of this, one way or the other.

[2] Although the district court and counsel had access to the names of the individual panel members, they were referenced by juror number to maintain their anonymity. We shall do the same.

Citing *Batson*, the defendants objected on the grounds that the government had used two of its peremptory strikes to remove the only non-white individuals on the panel—Juror 26 and Juror 58. As for Juror 26, the defendants observed that he was the only Black person on the panel and that he might be the only opportunity for the defendants to have a Black man on the jury. As for Juror 58, defendants contended that Juror 58 was also non-white because she spoke with a heavy Hispanic accent, had a dark complexion, and taught Spanish and ESL.

In response, the government argued it was unclear whether Juror 58 was a member of a racial or ethnic minority. Left with Juror 26, the government continued, the defendants could not establish a pattern of discriminatory conduct.

The district court agreed that it could not readily ascertain Juror 58's race or ethnicity. The court did not address the defendants' contention that Juror 58 had spoken with a heavy Hispanic accent, but it agreed to preserve the audio recording of the jury selection proceedings. The court emphasized, however, that, even if Juror 58 was non-white, it still would hold that the defendants had failed to demonstrate a *prima facie* case under *Batson* because, even if the government had used two peremptory strikes to exclude minority panel members, the defendants had not established a pattern of discrimination. "I must make a determination as to whether the side claiming racially discriminatory peremptory challenges has carried its burden of proving purposeful discrimination," the district court stated when discussing step one, "and I don't think the record would support that you have done so."

But a defendant's burden at step one is "light." *Bennett v. Gaetz*, 592 F.3d 786, 791 (7th Cir. 2010). He need only indicate "circumstances raising a suspicion that discrimination occurred." *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005). Indeed, to satisfy his burden to establish a *prima facie* case under step one, a defendant is not required to "prove" purposeful discrimination, by a preponderance of the evidence or otherwise. *Id.* Here, the district court committed legal error by requiring the defendants to do just that.[3]

Moreover, the district court and the government apparently assumed that the defendants were relying on the existence of a pattern of discriminatory challenges to satisfy their burden under *Batson*. But it is worth noting that "'a consistent pattern of official racial discrimination' is not 'a necessary predicate to a violation of the Equal Protection Clause.'" *Batson*, 476 U.S. at 95 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 n.14 (1977)). Depending on the circumstances, the use of a single discriminatory peremptory strike can be enough. *See Morse v. Hanks*, 172 F.3d 983, 985 (7th Cir. 1999) ("A prima facie case of purposeful discrimination can be established where the prosecution uses a peremptory challenge to strike the only black venireman in the panel."); *Bohen v. City of E. Chi., Ind.*, 799 F.2d 1180, 1186 (7th Cir. 1986); *see also Johnson v. California*, 545 U.S. 162, 169 (2005) ("[A] prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the prof-

---

[3] The government attempts to downplay the district court's comment as an inartful misstatement. But that statement was the court's only mention of the defendants' burden at step one of *Batson*, and so we have little choice but to assess the court's ruling using its own words.

fered facts gives 'rise to an inference of discriminatory purpose.'") (quoting *Batson*, 476 U.S. at 94) (footnote omitted).

Next, the defendants argue that the district court failed to satisfy *Batson*'s third step by not making a finding as to whether the government's stated nondiscriminatory reasons for exercising its peremptory challenges were credible. *See Batson*, 476 U.S. at 98 n.21. After concluding *voir dire* of the first panel, the district court revisited the defendants' *Batson* challenge after the lunch break. After stating that it remained convinced the defendants had not met step one, the court nevertheless invited the government to provide race-neutral reasons for striking both Juror 26 and Juror 58 to supplement the record (which is good practice in the event of an appeal).

As for Juror 58, the government steadfastly declined to offer any explanation, despite persistent prompting by the court. It tries to do so now, but, having forfeited its opportunity below, the government has relinquished its right to supply its reasons on appeal. *See United States v. Gimbel*, 782 F.2d 89, 91 (7th Cir. 1986) ("It is well-settled that an issue not presented in the district court cannot be raised for the first time on appeal[.]").

By contrast, the government presented four reasons for striking Juror 26. It noted that Juror 26 knew a potential government witness. Additionally, he worked for the Peoria Housing Authority, which managed Harrison Homes, a complex where members of the Bomb Squad had trafficked drugs and was the scene of multiple incidents alleged in the indictment. Juror 26 also had a prior arrest for domestic violence. And he himself had previously lived in the part of town where some of the alleged events occurred.

The defendants questioned whether these were the actual reasons for striking Juror 26 or merely after-the-fact concoctions. The prosecutor responded that the reasons were formulated before striking Juror 26, at which point the district court remarked, "I will find those are race-neutral reasons." This was the entirety of the district court's third-step analysis, which the defendants argue was insufficient.

We previously disapproved of a nearly identical statement because it fell well short of the credibility finding *Batson* requires. *See Lisle v. Welborn*, 933 F.3d 705 (7th Cir. 2019). "While we can glean some information from this record," we wrote, "we have no way to know whether the attorneys were credible." *Id.* at 715. As a result, we remanded the case so that the district court could make the necessary findings and conduct a new trial, if necessary. *Id.*

To its credit, the government concedes that *Lisle* is on all fours with this case. Accordingly, here too, we remand this case to the district court for the limited purpose of correctly employing the three-step process under *Batson* to evaluate the merits of the defendants' objections to the government's use of its peremptory challenges as to Juror 26 and Juror 58. Of course, we express no opinion on the outcome of the credibility issue, a matter for the district court to consider in the first instance. Depending on its findings, the district court may order a new trial, if necessary.

We shall retain jurisdiction of the appeal while the district court makes its additional findings. *See United States v. Paladino*, 401 F.3d 471, 484 (7th Cir. 2005). If the district court deems a new trial unnecessary, the parties may file position statements in this court seeking appellate review of the *Batson* determination. If the district court deems a new trial

necessary, it should inform this court of its conclusion. We will then issue a final resolution and the mandate.

We recognize that the remainder of this opinion may be largely mooted if the district court orders a new trial. But because the district court may not order a new trial or, if it does, certain issues raised by the defendants likely will be relevant to any retrial, we proceed to the remaining issues in the interest of judicial economy.

## 2. Disqualification of Prosecutor

Next, Flora, Dotson, and Wilson assert that the district court should have disqualified Assistant United States Attorney (AUSA) Ronald Hanna for having a conflict of interest. In 2012, Bomb Squad member Terrance Herron and thirteen others, none of whom are defendants in the instant case, were indicted for committing various federal crimes, including drug trafficking, between approximately January 2009 to February 2013. Herron pleaded guilty in July 2013 to possessing a firearm during and in relation to a drug trafficking crime and was sentenced in November 2013. Hanna had represented Herron in that case from October 2012 to September 2014, prior to joining the United States Attorney's Office.

In June 2017, federal investigators commenced a new investigation into the Bomb Squad, and Hanna, now an AUSA, became the lead prosecutor on that investigation in September 2017. This led to the indictment in this case, which was returned in June 2018 and alleged criminal conduct starting in about January 2013.

In the defendants' eyes, Hanna's prior work representing Herron raised a clear conflict of interest, and they moved to disqualify him on that basis. The district court disagreed.

We generally review a district court's denial of a motion to disqualify an attorney for abuse of discretion. *Watkins v. Trans Union, LLC*, 869 F.3d 514, 518 (7th Cir. 2017). But where, as here, "the district court does not hold an evidentiary hearing or make findings of fact to which we must defer, 'district courts enjoy no particular advantage over appellate courts in their formulation of ethical norms.'" *Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1064 (7th Cir. 1994) (quoting *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982), and applying abuse-of-discretion and *de novo* review).

Flora and Dotson contend that American Bar Association Model Rule of Professional Conduct 1.9 mandates Hanna's disqualification. (Before the district court, they relied on Illinois Rule of Professional Conduct 1.9, but that rule is more or less identical to the Model Rule.) Also, they argue for the first time on appeal that the district court's ruling contravened Illinois Rule of Professional Conduct 1.7, as well as the Due Process Clause of the Fourteenth Amendment, issues we review for plain error. *See United States v. Mikulski*, 35 F.4th 1074, 1077 (7th Cir. 2022) (stating that issues raised for first time on appeal are reviewed for plain error). What's more, Wilson adopts his co-defendants' arguments, and because he did not seek Hanna's disqualification below, we review this too under the plain error standard. *See United States v. Lara-Unzueta*, 735 F.3d 954, 958 (7th Cir. 2013).

"Most federal courts use the ethical rules of the states in which they sit[.]" *Huusko v. Jenkins*, 556 F.3d 633, 636 (7th Cir. 2009); *see* C.D. Ill. Local Rule 83.6(D) (stating that the Central District of Illinois has adopted the Illinois Rules of Professional Conduct). Federal prosecutors are generally subject to

the state's rules of professional conduct and local federal court rules. 28 U.S.C. § 530B(a); 28 C.F.R. § 77.1(b). The defendants' contention that the district court should have disqualified Hanna are unpersuasive.

First, Illinois Rule of Professional Conduct 1.7 did not require Hanna's disqualification. That rule prohibits a lawyer from representing a client "if the representation involves a concurrent conflict of interest," such as where "the representation of that client will be directly adverse to another client." Defendants cite *Board of Managers of Eleventh Street Loftiminium Ass'n v. Wabash Loftiminium, L.L.C.*, 876 N.E.2d 65, 67 (Ill. App. Ct. 2007). But, in that case, the law firm in question had represented the individual defendants as well as the corporations they held at the same time. *Id.* at 75. By contrast, Hanna's representation of Herron was limited to a specific matter, and Hanna did not represent Herron and the government simultaneously.

Turning to Illinois Rule of Professional Conduct 1.9, it provides in pertinent part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.
>
>    ***
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm

has formerly represented a client in a matter
shall not thereafter:

> (1) use information relating to the repre-
> sentation to the disadvantage of the for-
> mer client except as these Rules would
> permit or require with respect to a client,
> or when the information has become
> generally known; or

> (2) reveal information relating to the rep-
> resentation except as these Rules would
> permit or require with respect to a client.

"Rule 1.9 is a prophylactic rule to prevent even the potential
that a former client's confidences and secrets may be used
against him." *Havens v. Indiana*, 793 F.2d 143, 145 (7th Cir.
1986).

While we are mindful of the ethical considerations in-
volved, the district court did not abuse its discretion (let
alone, commit plain error) in denying the defendants' motion.
We recognize that the conspiracy for which Herron was in-
dicted and the conspiracy alleged here may have overlapped
in January and February 2013. But the defendants have not
presented any relationship, substantial or otherwise, between
the overt acts alleged in Herron's case and those the govern-
ment presented at trial. Nor is there any overlap between the
defendants in the two cases, and none of the defendants in
Herron's case testified in this case.

The defendants point out that the government did ap-
proach one of the defendants from the prior case to see if he
would be willing to assist the investigation that led to this

case. But we think this, without more, is insufficient to establish a violation of Rule 1.9.

The cases the defendants cite are of little help. For example, in *United States v. Goot*, the prosecutors had previously represented the same individual who was being prosecuted. 894 F.2d 231, 233 (7th Cir. 1990). In *United States v. Volpendesto*, the defense attorney had represented an individual who was scheduled to testify against his current client. 746 F.3d 273, 283 (7th Cir. 2014). In some of the cases the defendants cite, the attorney in question was challenging the validity of a contract against a party that he had previously advised regarding the same contract. *See, e.g.*, *Cromley*, 17 F.3d at 1063. And, in others, the attorney faced the possibility of cross-examining current or former clients at trial. *See, e.g.*, *Wheat v. United States*, 486 U.S. 153, 155–56 (1988), *United States v. Turner*, 594 F.3d 946, 949 (7th Cir. 2010); *Hall v. United States*, 371 F.3d 969, 971–72 (7th Cir. 2004); *United States v. O'Malley*, 786 F.2d 786, 790 (7th Cir. 1986). Here, Hanna has never represented any of the defendants or witnesses in this case.

Nor is there evidence in the record that Hanna gained any privileged information during his representation of Herron that was useful to the government here. Herron was not called as a witness, and the government did not seek to admit any of Herron's statements at trial. That said, Herron's name did come up once during the trial. John Thomas, a Bomb Squad member who was cooperating with the government, mentioned Herron when he was asked to identify the individuals in a photograph. Hanna then asked Thomas whether Herron was a Bomb Squad member and to identify the gesture Herron was making with his hand.

The defendants do not contend that this was privileged information Hanna obtained during his representation of Herron, nor could they. Herron's involvement in the Bomb Squad and the prior case was a matter of public record. *See Havens*, 793 F.2d at 145 (finding no constitutional or ethical violation where a prosecutor, who had previously represented a defendant, cross-examined him about his membership in a gang at a subsequent trial, because the prosecutor would have had access to information about defendant's background, including gang membership). And the defendants can only speculate that Hanna must have learned from Herron that Flora was one of the shooters that killed Chester in July 2013. But three cooperating witnesses testified to this fact at trial, and the defendants do not contend that any of them were involved in Herron's case.

For these reasons, the district court did not commit reversible error when denying the defendants' motion to disqualify Hanna. Nor did its ruling deprive Flora, Dotson, and Wilson of their rights to a fair trial. That said, we do think it advisable in the future for the United States Attorney to exercise great care when assigning cases so that the impartiality of the government is beyond reproach.

### B.  Individually Raised Issues

#### 1.  Williams: The Indictment

Williams contends that the Third Superseding Indictment was so vague as to render it unconstitutional. That is why, in his view, the jury convicted him of engaging in a RICO conspiracy (Count 1) and possession with intent to distribute marijuana (Count 41), but acquitted him of two other predicate acts.

Although the government argues Williams has waived this issue below, we address the merits because the issue is easily dispatched under *de novo* review. *See United States v. Ramsey*, 406 F.3d 426, 429 (7th Cir. 2005). An indictment "adequately set[s] forth the elements of a racketeering conspiracy" if it (1) identifies "a proper enterprise and the defendant's association with that enterprise" and (2) charges that "the defendant knowingly joined a conspiracy, the objective of which was to operate that enterprise through a pattern of racketeering activity." *United States v. Tello*, 687 F.3d 785, 794 (7th Cir. 2012). A RICO conspiracy indictment need not allege "that the defendant committed two predicate acts of racketeering" or "that any such acts were ultimately committed by anyone." *Id.* at 792. The indictment also need not identify the specific predicate acts or overt acts that the defendant agreed would be committed. *Id.* at 795; *see Salinas v. United States*, 522 U.S. 52, 63 (1997).

Count 1 of the Third Superseding Indictment alleged that (1) the Bomb Squad was an "enterprise" within the meaning of the statute; (2) Williams agreed to conduct or participate in the Bomb Squad's affairs; and (3) Williams agreed that one or more Bomb Squad members would commit at least two predicate acts of racketeering—here, murder, attempted murder, assault, robbery, arson, and drug trafficking. Nothing more was required.

### 2. Dotson: Severance

Dotson argues that the district court erred in denying his motion to sever his trial from that of his codefendants, an issue we review for abuse of discretion. *United States v. Jett*, 908 F.3d 252, 275 (7th Cir. 2018). Dotson bears the "extremely difficult burden" of demonstrating that the joint trial caused him

"actual prejudice." *See United States v. Maggard*, 865 F.3d 960, 971 (7th Cir. 2017) (internal quotation marks omitted). To do so, he must do more than show that he "would have had a better chance of acquittal" in a separate trial; he must demonstrate that he was "unable to obtain a fair trial without severance." *See United States v. Peterson*, 823 F.3d 1113, 1124 (7th Cir. 2016). Dotson offers two arguments to meet his burden.

First, Dotson points to the cross-examination of Amos Stimage conducted by counsel for a codefendant, in which Stimage expressed his belief that Dotson was cooperating with the government to avoid prosecution. According to Dotson, this indicated to the jury that Dotson was guilty. Stimage's statement, however, had little chance of swaying the jury because, after all, Dotson was on trial and, unlike the other cooperating witnesses, he did not testify against his fellow Bomb Squad members.

Dotson also argues that the vast array of evidence the government introduced to incriminate his codefendants irreparably tainted the jury's view of him as well. But the district court properly instructed the jury to consider the evidence against each defendant separately, without allowing its decision as to one defendant influence its decision as to any other. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993); *United States v. Morales*, 655 F.3d 608, 625 (7th Cir. 2011). Furthermore, even if Dotson had been tried separately, the government would have been permitted to introduce evidence of the Bomb Squad's other racketeering activities, along with Dotson's assent, to prove that Dotson had knowingly participated in the RICO conspiracy, even if he had not committed them personally. *See Morales*, 655 F.3d at 627. Given this, the district court acted well within its discretion in denying his motion to sever.

**C. Sufficiency of Evidence and Motions for New Trial**

We now turn to the arguments each defendant raises to attack the sufficiency of evidence supporting his individual conviction, as well as the district court's denial of the defendants' motions for a new trial or judgment as a matter of law.

We review the denial of a motion for a new trial for abuse of discretion. *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022). "De novo review applies to the denial of a motion for judgment of acquittal; practically speaking, however, the standard of review is that for sufficiency of the evidence." *Peterson*, 823 F.3d at 1120. "In a sufficiency-of-the-evidence challenge after a jury verdict, we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021). "[W]e respect the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) (internal quotation marks omitted). "We will overturn a conviction only if, after reviewing the record in this light, we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Anderson*, 988 F.3d at 424. "This burden is a high one—one we have described as 'nearly insurmountable.'" *United States v. Fitzpatrick*, 32 F.4th 644, 649 (7th Cir. 2022) (quoting *Anderson*, 988 F.3d at 424).

**1. Dotson: No RICO Enterprise**

According to Dotson, his conviction on Count 1 should be overturned because the government failed to prove that the

Bomb Squad was a RICO enterprise. To prove a RICO conspiracy under § 1962(d), "the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other." *Boyle v. United States*, 556 U.S. 938, 947 (2009) (internal quotation marks omitted).

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In turn, an association-in-fact is a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 944 (internal quotation marks omitted). An association-in-fact "need not have any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *Boyle*, 556 U.S. at 946).

Dotson asserts that, although various defendants came together at various points to engage in the predicate acts, they were independent participants involved in unrelated criminal activity that lacked any organization or structure. But this gloss casts the facts in a light most favorable to him, rather than the government.

As outlined above, the trial evidence clearly showed that the Bomb Squad was a distinct group that protected specific territory in Peoria. Several witnesses testified that the Bomb Squad and its members were identifiable by special

handshakes, hand signs, and tattoos. *See Brown*, 973 F.3d at 684 (considering tattoos and hand signs as evidence of an enterprise). These outward displays of an alliance appeared in numerous videos and photographs.

What's more, the Bomb Squad also held meetings at the homes of members to discuss plans to shoot rival gang members, sell drugs, and punish members for infractions like stealing from the gang. Typically, higher-ranking members, including Raheem Wilson (nicknamed "Boosie") and Haywood, made the decisions, while lower-ranking members strove to higher ranks by committing acts of violence and ruthlessness. And members loaned each other guns to commit these crimes and sometimes posted bond for each other when they were arrested. Moreover, multiple witnesses testified that the defendants carried out robberies, assaults, arson, attempted murders, and murders in order to protect the gang's territory and to retaliate against rival gang members.

The jury also heard evidence of the Bomb Squad's coordinated drug-trafficking activity. The gang operated trap houses where illegal drugs were stored and distributed. And its members, including Dotson, Rashaad Flora (Mytrez Flora's cousin), Johnson, and Williams, used these locations to distribute their illegal drugs.

In short, there is ample evidence from which a reasonable jury could conclude that the Bomb Squad was a RICO enterprise.

### 2. Dotson and Watkins: No Agreement to Join RICO Conspiracy

Dotson and Watkins separately challenge the sufficiency of the evidence that they had agreed to join the racketeering

conspiracy. To make its case, the government needed to prove that Dotson and Watkins agreed to two things: (1) that they would participate in the affairs of the Bomb Squad through a pattern of racketeering activity, and (2) that a member of the conspiracy would commit at least two predicate acts in furtherance of it. *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017). It is not necessary for the government to show that Dotson and Watkins actually were members of the Bomb Squad. *See Morales*, 655 F.3d at 629. Nor did they have to agree to personally commit the predicate acts themselves. *See United States v. Amaya*, 828 F.3d 518, 530 (7th Cir. 2016).

The record contains ample evidence of Dotson's agreement to participate in the racketeering conspiracy. For example, in July 2013, Dotson (along with Haywood and Flora) shot at the car of a rival gang member, Scott, killing a passenger. Then, in February 2017, to retaliate for Boosie's murder, Dotson helped burn down a bakery owned by the family of a rival gang member, Greenwood. And, in May of that year, Dotson fired eighteen shots at Greenwood's car, striking a passenger. Dotson committed these acts to support the Bomb Squad's criminal activities.

The same is true for Watkins. At a Bradley University party in April 2018, Watkins pointed out a rival gang member, Polnitz, to a Bomb Squad member and passed a gun to him to shoot Polnitz. The Bomb Squad member obeyed, killing Polnitz and a student. In addition, Watkins agreed to hold guns for Bomb Squad members and appeared in a social media video to promote Rashaad's drug sales.

There is more evidence, but the evidence noted above was sufficient for the jury to find that Dotson and Watkins agreed

to conduct the Bomb Squad's affairs and actively participated in numerous predicate acts in furtherance of the gang's goals.

### 3. Haywood and Dotson: Additional Findings

Pursuant to 18 U.S.C. § 1963(a), the government sought maximum sentences of life for Haywood based on his involvement in the murders of Brown and Chester and for Dotson based on his participation in Chester's murder. Although the standard statutory maximum sentence for a RICO conspiracy conviction is twenty years' imprisonment, it increases to life imprisonment "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." § 1963(a). For this enhancement to apply, the jury must make additional findings of fact regarding the racketeering activity at issue. Here, the jury did so on an additional verdict form the court provided for that purpose. Haywood and Dotson challenge the district court's application of § 1963(a) to their individual sentences on several grounds.

### a) Haywood

### 1) Mislabeled Verdict Form

Haywood first objects to the additional verdict form itself, which was entitled "Government's Proposed Additional Findings" rather than just "Additional Findings."[4] According to Haywood, this implicitly endorsed the government's desired outcome to his detriment. Because Haywood did not timely object to the verdict form during the trial, we review for plain error. *See United States v. Gonzalez-Velez*, 466 F.3d 27,

---

[4] Although the court had given the jury replacement pages for Haywood's verdict form with the "Additional Findings" caption, the jury mistakenly used the old form to record its verdict.

36 (1st Cir. 2006) (holding that verdict-form issue raised by a defendant who did not timely object to a special verdict form during conference was subject to plain error review); *see also United States v. Olano*, 507 U.S. 725, 735 (1993) ("If the forfeited error is plain and affect[s] substantial rights, the court of appeals has authority to order correction, but is not required to do so.") (internal quotation marks omitted).

It is difficult to see how the jury could have viewed the mislabeled caption as the court's endorsement of the government's position. After all, it merely suggests that the government requested the findings and leaves it up to the jury to agree (or not) to them. If anything, the caption reminds the jury that it was the government's burden to prove the allegations in the case.

Nor did Haywood suffer any prejudice as a result. Upon discovering the mislabeling, the district court polled the jury to determine whether amending the caption would have made a difference to its verdict; each juror replied in the negative. Thus, the court's use of the incorrectly captioned verdict form was not plain error.

### 2) Brown's Murder

As noted, for a maximum life sentence under § 1963(a) to apply, the government must prove that the RICO violation is based on "a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a); *see Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The government pointed to Haywood's killing of Brown in June 2013 as the "racketeering activity" that triggered § 1963(a)'s life sentence maximum. And, because the murder took place in Illinois, we look to Illinois law to see when murder can carry a

life sentence. *See United States v. Perez*, 21 F.4th 490 (7th Cir. 2021), *cert. denied*, 143 S. Ct. 257 (2022).

"Illinois law authorizes a sentence of life imprisonment for first-degree murder when certain aggravating factors are present." *Id.* at 493. Here, the government relied on two aggravating factors that, it believed, made Haywood eligible for life imprisonment. First, Haywood's killing of Brown was "committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 Ill. Comp. Stat. 5/9-1(b)(11); 730 Ill. Comp. Stat. 5/5-8-1(a)(1)(b). In the alternative, the government posited, Haywood "personally discharged a firearm that proximately caused … death to another person." 730 Ill. Comp. Stat. 5/5-8-1(a)(1)(d)(iii). The jury found that the government had proved each of these things beyond a reasonable doubt.

Haywood argues that there was insufficient evidence to support these findings by the jury. In his view, two of the trial witnesses failed to identify him as the shooter, and certain factual inconsistencies between the surveillance video and witness testimony undermined the government's theory that he was the shooter. This, he says, created reasonable doubt that he was the one who shot Brown.

The jury's additional findings find ample support in the record. Faulkner testified that he was at a house with Johnson, Barnes, and Dominick Wilson on June 23, 2013, when Haywood arrived. Haywood told Faulkner and Johnson that members of Zone 4 had just chased him near Western Avenue. Haywood said that he needed a "pipe," meaning a gun, and

Barnes gave him a .22-caliber long-barrel gun, one that does not eject shell casings. Then Haywood and Johnson left on bicycles.

Shortly thereafter, Brown, a member of Zone 4, was shot near Western Avenue. Before Brown's murder, an eyewitness saw two men on bicycles cross Western Avenue. Another eyewitness, Christopher Edwards, saw one of the bicyclists stopped between two houses, across the street from a house where Brown and others had gathered. The bicyclist drew a gun and fired several shots at the group of men, and a .22-caliber bullet pierced Brown's arm and struck the side of his chest. Brown died afterward from wounds caused by the bullet.

According to Wilson, within an hour after Barnes had given Haywood the .22-caliber gun, a sweaty Haywood and Johnson returned to the house, and Haywood handed the gun back to Barnes. Johnson recounted that there was a shoot-out and someone had gotten shot in the side. And Haywood later told Thomas and Terry Moss, another Bomb Squad member who cooperated with the government, that he had shot and killed Brown.

The police found no shell casings at the murder scene, but a nearby store's surveillance camera captured two bicyclists riding away from the area less than thirty seconds after the shooting. When Faulkner viewed the video at trial, he identified the bicyclists as Haywood and Johnson.

From this evidence, a reasonable jury could have found that Brown's murder was part of the Bomb Squad's RICO conspiracy and Haywood was complicit in it. Furthermore, from these facts, a reasonable jury could have concluded that

Haywood had planned to commit the murder in a cold, calculated, and premeditated manner that could reasonably be expected to result in Brown's death and that Haywood had personally shot and killed Brown. Thus, the district court properly denied Haywood's motion for a new trial or judgment as a matter of law.

### b) Haywood and Dotson: Chester's Murder

As part of its additional findings supporting maximum life sentences as to Haywood and Dotson, the jury also found that Chester's murder was part of the RICO conspiracy to which Haywood and Dotson assented. But the jury stopped short of finding that they had committed the act in a cold, calculated, and premeditated manner that could reasonably be expected to result in the death of a human being as Illinois law required. Thus, Haywood's and Dotson's contention that the record did not support an enhancement under § 1963(a) is moot.[5]

### 4. Wilson, Washington, and Haywood: Sufficiency of Evidence

Wilson, Washington, and Haywood separately argue that the evidence was insufficient to support their convictions for assault and attempted murder under 18 U.S.C. § 1959(a) and use of a deadly or dangerous weapon during a crime of violence under 18 U.S.C. § 924(c)(1)(A). We first address a

---

[5] To the extent that Dotson asserts that his convictions for Counts 26 and 27 also relate to Chester's murder, he is mistaken. Those counts relate to the assault and attempted murder of Greenwood and for use of a deadly or dangerous weapon during that crime. And Dotson has not raised any arguments specific to Greenwood.

common issue raised by these defendants, then proceed to their individual arguments.

Section 1959(a) requires proof that a defendant (1) committed assault with a dangerous weapon or attempted or conspired to commit murder (2) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." *See* 18 U.S.C. § 1959(a)(3), (5); *Amaya*, 828 F.3d at 530. Section 924(c), in turn, prohibits using a firearm "during and in relation to any crime of violence," 18 U.S.C. § 924(c)(1)(A), which requires the government to prove (among other things) that the defendant committed a predicate crime of violence. *United States v. Morrow*, 5 F.4th 808, 815 (7th Cir. 2021).

Each of these defendants contends that the government failed to present sufficient evidence that he committed a predicate offense for the purpose of maintaining or increasing his position in the Bomb Squad. But the record speaks otherwise.

Thomas testified that gang members achieved higher status by committing acts of violence, and the most ruthless members were the most respected. Faulkner explained that a member with a reputation for shooting and killing others earned respect and recognition within the gang. Moss admitted that he had participated in violent acts of retaliation simply because that was what Bomb Squad members were expected to do.

When Wilson, Washington, and Haywood committed their respective offenses—Wilson's shooting of Richardson on May 12, 2016; Washington's shooting of Perkins on July 10, 2016; Haywood's shooting of Jones on August 6, 2017—they did so in front of, alongside, or in defense of, other Bomb

Squad members. And, afterwards, they told or bragged to other Bomb Squad members about their deeds to ensure they received credit. From these facts, a reasonable jury could find that they each had engaged in the offenses to maintain or increase his position in the Bomb Squad.

### a) Wilson: Assault and Attempted Murder

Wilson was convicted of assaulting and attempting to murder Richardson under § 1959(a) (Count 12) and using a firearm in furtherance of a violent crime under § 924(c)(1)(A) (Count 13). According to Wilson, the record contains insufficient evidence to support his conviction, and, alternatively, he is entitled to a new trial because the conviction was against the weight of the evidence.

Richardson was a heroin dealer unaffiliated with the Bomb Squad. According to his testimony, he was playing a dice game with Washington and others behind a liquor store on May 12, 2016. During the game, Wilson tapped Richardson on the back, pointed a gun at his face from a couple of feet away, and demanded his money. When Richardson did not comply, Wilson shot him in the hand. Richardson then threw his money down and began to run away, and Wilson shot him in the back. After Richardson fell to the ground, Wilson stood over him with his gun. Richardson raised his hands in anticipation of being shot again when the other players told Wilson not to kill Richardson. Wilson then took everyone's money and fled the scene.

Richardson's account is corroborated by other Bomb Squad members. Faulkner testified that he saw Wilson snatch everyone's money and shoot Richardson that day, but that Wilson later returned money he had stolen from Bomb Squad

members. Moss and Timothy both testified that Wilson admitted that he had shot Richardson that night.

For his part, Wilson argues that Faulkner, Moss, and Timothy cannot be believed, because they were cooperating with the government to gain reduced sentences. But this still leaves the unrebutted testimony of Richardson himself, and, in any case, the credibility of witnesses is for the jury to decide.

Accordingly, there was sufficient evidence to convict Wilson on Counts 12 and 13. Nor did the district court abuse its discretion in denying Wilson's motion for a new trial.

### b) Washington: Assault and Attempted Murder

Washington asserts that he is entitled to an acquittal or a new trial because the government obtained his conviction for assault and attempted murder under 18 U.S.C. § 1959(a)(3) and (5) (Count 16) and for use of a firearm during a crime of violence under § 924(c)(1)(A) (Count 17) based entirely on his uncorroborated admissions that he had shot Perkins on July 10, 2016. "It is a settled principle … that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488–89 (1963). For example, "an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim." *Id.* at 491 n.15. And for crimes involving "physical damage to person or property," a confession may be corroborated with evidence "that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable." *Id.*; *see United States v. Baltrunas*, 957 F.2d 491, 494 (7th Cir. 1992) (evidence that bank robbery occurred is sufficient to corroborate a defendant's confession).

The purpose of this requirement is "not to establish the admission itself, but rather to ensure its reliability." *United States v. Curtis*, 324 F.3d 501, 507 (7th Cir. 2003); *see United States v. Bukowski*, 435 F.2d 1094, 1106 (7th Cir. 1970). "It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper v. United States*, 348 U.S. 84, 93 (1954).

At the trial, Thomas testified that Washington had told him that he had shot Perkins, a member of Moe Block, a rival gang. Washington recounted that, on July 10, 2016, he, Crowe, and another Bomb Squad member, Tremaine Drummond (nicknamed "Misal"), saw Perkins and Austin Woods standing outside of a club. Drummond did not have a gun, but Washington and Crowe did, and they shot at Perkins and Woods. Washington bragged that he had shot first and that he knew he had hit Perkins because Perkins fell to the ground.

Thomas also spoke to Crowe about the shooting. Crowe confirmed that he and Washington carried out the shooting, and that Drummond was there but did not have a gun. When Thomas reported to Crowe that Washington had bragged about shooting Perkins, Crowe laughed and said Washington was lying because there was no way to know whether Crowe or Washington had shot Perkins.

According to Moss, he saw Washington and Crowe about thirty minutes after the Perkins shooting. Washington told Moss that he had shot Perkins, stating, "I popped his ass." Moss saw that Washington still had the gun on him, which, as Moss recalled, was "a 9 or a .40." During the conversation, Crowe disagreed with Washington and claimed that he was the one who had shot Perkins.

The evidence at trial corroborated the essential facts in Washington's admission to Thomas. First, Perkins testified that he indeed was shot in the leg on July 10, 2016. He also confirmed that Woods was with him that night and that two Black males had yelled at them that night. Moreover, he told a police officer at the hospital immediately after the shooting that he had been shot in the leg by two people.[6] Furthermore, police officers recovered 9mm shell casings at the scene, substantiating Moss's recollection that Washington was carrying a "9 or a .40" that evening. And there was ample evidence that Washington had access to firearms of all types during this time and of the animosity between the Bomb Squad and the Moe Block gang.

Washington takes issue with Thomas's credibility as a cooperating witness and the gaps in Perkins's testimony. But the essential elements of their testimony are corroborated by the trial evidence. And the district court committed no error in denying his motion.

### c)  Haywood: Assault and Attempted Murder

The jury also convicted Haywood of the assault and attempted murder of Jones under 18 U.S.C. § 1959(a)(3) and (5) (Count 30), as well as the use of a firearm during a crime of violence under § 924(c)(1)(A) (Count 31). Haywood argues that there was insufficient evidence to convict him of these charges. He also generally asserts that the district court erred in denying his motions for acquittal and a new trial.

---

[6] During his testimony, Perkins occasionally contradicted prior statements about the event or claimed he did not remember, but the jury was entitled to evaluate his testimony as a whole and in the context of the other evidence in the case.

Jones, who is unaffiliated with any Peoria gang, testified that, on August 16, 2017, he walked past three to four young Black men and had "minor words" with them on his way to his aunt's apartment in Harrison Homes. They said, "Ahh, there he go right there." As Jones opened his aunt's screen door, a Black man with braids or dreadlocks rode up on a BMX bike. The man shot at Jones twice: one of the bullets struck Jones's right knee, and the other hit his cell phone in his right front pocket.

Jones's cousin, Danaja Dillard, testified that she was outside when the shooter rode up on his bike and shot Jones. She saw Jones trying to get into her house, but the door was locked. So, Dillard ran to the back door to enter the house and ran through the house to unlock the front door for Jones. She recounted that she saw the shooter, that she knew his name was "Nunu" (which three other witnesses confirmed is Haywood's nickname), and that he had dark skin with dreadlocks.

Officer Shannon Parnell testified that he was the first to arrive at the apartment. He found Jones, who was animated, excited, and obviously in pain. As Parnell applied pressure to Jones's wound, he asked Jones who had shot him, and Jones responded, "Nunu," based on what Dillard had told him.[7]

---

[7] Haywood contends that Parnell's statement was based on inadmissible double hearsay, an issue we review for an abuse of discretion, *see United States v. Bell*, 28 F.4th 757, 762 (7th Cir. 2022). The district court's decision was not an abuse of discretion because Dillard's and Jones's statements were admissible.

First, Dillard's statement to Jones was admissible as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B) because Dillard testified at trial, her statement was consistent with her trial testimony, the

Queen Hatcher, who is Jones's aunt and Dillard's mother, testified that she was a witness during Haywood's criminal proceedings in state court regarding the shooting of Jones. She recalled that "Wody" (Ezra Johnson's nickname) came to her home, asked to speak to Dillard about Haywood, and stated that he had $500 for Dillard. Hatcher ousted Johnson from her house, but not before he warned: "Well, we can get on some gangsta shit."

Like her mom, Dillard also stated that she was scheduled to be a witness in Haywood's criminal trial in state court. She also remembered that Johnson had come to the house and offered her money not to testify against Haywood, but she did not take the money.

Johnson's visit to Hatcher's and Dillard's home lends further support for the government's contention that Haywood had shot Jones. Because Johnson had previously helped Haywood commit Brown's shooting, a rational juror could conclude that Johnson was close to Haywood. Furthermore, a

---

statement was offered to rebut the insinuation on cross-examination that she was fabricating the statement, and the statement was made before Dillard had a motive to fabricate. *See United States v. Stoecker*, 215 F.3d 788, 791 (7th Cir. 2000); *United States v. Green*, 258 F.3d 683 (7th Cir. 2001) ("Rule 801(d)(1)(B) does not bar the introduction of a prior consistent statement through the testimony of someone other than the declarant, so long as the declarant is available for cross-examination about the statement at some time during trial.").

Turning to the next level of hearsay, Jones's statement to Parnell falls under the exception to the hearsay rules for excited utterances because it "relat[ed] to a startling event or condition, made while the declarant was under the stress of the excitement caused." Fed. R. Evid. 803(2). Parnell spoke to Jones on the heels of the shooting and reported that Jones was animated, excited, and in pain. Under these facts, we cannot say that the district court abused its discretion in admitting Parnell's testimony.

jury could reasonably infer from Johnson's attempts to dissuade Dillard from testifying, that her identification of Haywood as the shooter was credible.

Other evidence also tied Haywood to the shooting. Jones described the shooter as a "Black male" with "some braids or dreads," and Dillard described him as a dark-skinned man with "dreads." A photograph of Haywood on the day of the shooting matched those physical descriptions.

Both Jones and Dillard recalled that the shooter arrived on a bike. Haywood had previously used a bicycle to travel to the scene of Brown's murder.

Lastly, a rational jury could have found that Haywood shot Jones after Jones "had minor words" with the three or four men on the way to his aunt's house, especially when Haywood shot him after saying, "I heard you had some words with my people." Based on this evidence, a jury could reasonably find that Haywood shot Jones to maintain or increase his position in the Bomb Squad.[8]

When viewing all of this evidence in the government's favor, there was ample evidence allowing a jury to find Haywood's guilt as to Counts 30 and 31 beyond a reasonable doubt. The district court did not err in denying Haywood's motions for acquittal or a new trial on this basis.

---

[8] Contrary to Haywood's assertion otherwise, the government was not required to prove that Jones was shot because he was selling marijuana in Bomb Squad territory. Counts 30 and 31 do not contain that allegation. And although Count One's Overt Act (gg) included that allegation, it was not essential to the charge and, therefore, is "mere surplusage." *See United States v. Swanson*, 394 F.3d 520, 525 (7th Cir. 2005).

**D. Sentencing**

Lastly, Watkins and Flora challenge various aspects of their sentences. Watkins asserts that his sentence was substantively unreasonable. Flora argues that the district court erred when it found him ineligible for credit for time served on a state court conviction.

We review the district court's legal interpretation of the Sentencing Guidelines *de novo*. *United States v. Ford*, 22 F.4th 687, 691 (7th Cir. 2022). We review a sentence's substantive reasonableness for abuse of discretion and the district court's underlying factual findings for clear error. *United States v. Major*, 33 F.4th 370, 379 (7th Cir. 2022).

**1. Watkins**

Watkins challenges the reasonableness of his sentence for his conviction under Count 1, the racketeering conspiracy. Based on his total offense level of 43 and criminal history category of IV, the bottom end of Watkins's guideline range was 240 months' imprisonment. He received a custodial sentence of 228 months, below the guideline range. In such cases, "there is a nearly irrebuttable presumption that a below-range sentence is reasonable." *United States v. Miller*, 829 F.3d 519, 527 (7th Cir. 2016). A defendant can only rebut this presumption "by showing that the sentence does not comport with the factors outlined in 18 U.S.C. § 3553(a)." *United States v. Patel*, 921 F.3d 663, 672 (7th Cir. 2019) (quoting *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018)).

In considering Watkins's sentence, the district court took note of the numerous aggravating factors—the serious and violent nature of the RICO conspiracy; Watkins's pattern of rebuffing chances to lead a law-abiding life; the need to deter

him from future crimes given the high risk of recidivism; the need to protect residents of Peoria's south side from his violence; as well as Watkins's personal involvement in Polnitz's and Murray's murders. Against this, the district court also weighed the various mitigating factors, including the statement of Demario Boone, a school safety officer, that Watkins has the potential to make something of himself. The district court's careful consideration of these and other relevant factors satisfy the requirements of § 3553(a).

Watkins attempts to trivialize his criminal conduct, claiming that he merely handed Brock the gun that was used to murder Polnitz and Murray. But Watkins did much more than that. He pointed out Polnitz as a rival gang member to Brock and then gave him the gun, after which Brock shot at Polnitz, killing Polnitz and Murray. It was not clearly erroneous for the district court to find that Watkins gave the gun to Brock, knowing (indeed, wanting) Brock to shoot Polnitz.

Watkins also complains that the length of his sentence is unreasonable when compared to those of McCree and Moss, who were convicted of a greater number of offenses. But, unlike Watkins, McCree and Moss pleaded guilty prior to trial. Moreover, Moss cooperated with the government and testified at trial. This distinguishes McCree and Moss from Watkins for sentencing purposes.

Put simply, Watkins has not rebutted the presumption that his below-range sentence was reasonable. Accordingly, the district court did not abuse its discretion when sentencing Watkins to a prison term of 228 months.

## 2. Flora

Lastly, Flora argues that the time he served on his state weapon-possession conviction related to Chester's murder should have been credited to his federal sentence. As he sees it, the district court erred in concluding that his weapon-possession offense did not constitute relevant conduct, thereby making inapplicable a downward departure under United States Sentencing Guideline § 5K2.23.

Section 5K2.23 permits a downward departure for a completed term of imprisonment if § 5G1.3(b) "would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing." Section 5G1.3(b), in turn, authorizes a sentencing adjustment where the defendant has an undischarged term of imprisonment for an offense that "is relevant conduct to the instant offense of conviction" under § 1B1.3(a)(1), (2), or (3).

Flora was convicted of RICO conspiracy, so § 2E1.1 provided his offense level.[9] *See* U.S.S.G. App. A. Under § 2E1.1(a)(2), Flora's base offense level was "the offense level applicable to the underlying racketeering activity." Application Note 4 provides that a RICO-conspiracy count may charge certain conduct "as a part of a 'pattern of racketeering activity' even though the defendant has previously been sentenced for that conduct." But if such a prior sentence "resulted from a conviction prior to the last overt act of the instant offense," Application Note 4 specifically states that the

---

[9] Although Flora argues that the court should have applied § 1B1.3(a) to determine whether his prior offense constituted relevant conduct, he is incorrect. That section starts out with the qualification "[u]nless otherwise specified." Here, § 2E1.1 specifies otherwise.

predicate act should be counted as a prior sentence under § 4A1.2(a)(1), rather than part of the RICO offense. U.S.S.G. § 2E1.1 cmt. n.4; *see United States v. De La Cruz*, 897 F.3d 841, 843 (7th Cir. 2018); *Morales*, 655 F.3d at 639.

Flora pleaded guilty to weapon possession in 2013. He served approximately thirty-two months in prison and was released in 2016. The district court found that Flora remained a member of the RICO conspiracy through at least May 9, 2017, when he acted as an accessory to the attempted murder of the worker at Starr Street Market. Because Flora's 2013 conviction occurred prior to the last overt act of the RICO conspiracy, the district court correctly treated his prior sentence for weapon possession as part of his criminal history, rather than relevant conduct. *See* U.S.S.G. § 2E1.1, cmt. n.4. Thus, Flora's 2013 conviction did not entitle him to a downward departure under § 5K2.23.

**III. Conclusion**

For the above reasons, we issue a limited remand so that the district court may make additional findings under *Batson* consistent with this opinion and, after doing so, order a new trial if it deems it necessary. We express no opinion on the outcome of the district court's rulings.

We shall retain jurisdiction of the appeal while the district court makes its additional findings. If the district court deems a new trial unnecessary, the parties may file position statements in this court seeking appellate review of the *Batson* determination. If the district court deems a new trial necessary, it should inform this court of its conclusion so that we may issue a final resolution and the mandate.

As we noted at the outset, if the district court does order a new trial, much of this opinion becomes moot. But, because the court may not order a new trial or, if it does, certain issues likely will be relevant to any retrial, we have addressed the remaining issues raised by the defendants in the interest of judicial economy and find no reversible error.